IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE STAR SCIENTIFIC, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>) | Master File No.: 3:13-CV-00183-JAG<br><br><u>CLASS ACTION</u> |

**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS
<u>OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE .......................................................................6

III.  PARTIES ...........................................................................................................6

IV.  BACKGROUND ...............................................................................................8

      A.    Defendant Williams' Prior Business Ventures .......................................8

      B.    Formation of Star Scientific ...............................................................13

      C.    The New Star Scientific .......................................................................17

      D.    Star Scientific's Deteriorating Financial Picture .................................18

      E.    Launching of Anatabloc ......................................................................18

      F.    Star Scientific's Collaboration with the Roskamp Institute in Testing Anatabloc .............................................................................................19

      G.    Virginia Governor's Promotion of Anatabloc ......................................20

      H.    Star Scientific's Scheme to Falsely Promote Johns Hopkins as Being Involved in Studying Anatabloc .........................................................22

            1.    The Animal Study ....................................................................23

            2.    The Human Study ....................................................................27

      I.    U.S. Department of Justice Subpoenas .................................................31

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .................................................................31

VI.  THE TRUTH IS REVEALED ......................................................................44

VII. LOSS CAUSATION ......................................................................................48

VIII. DEFENDANTS ACTED WITH SCIENTER .................................................51

      A.    Defendant Williams Knew, or Recklessly Disregarded the Fact that Defendants' Public Statements About Johns Hopkins' Involvement in the Animal Study and Human Study Were False, Incomplete, and/or Materially Misleading ........................................................................52

      B.    Defendants' Fraudulent Conduct Was Motivated by the Desperate Need to Obtain Additional Funding and Maintain the Company's Ongoing Operations ..........................................................................................54

            1.    The Company's Need for Significant Financing .......................54

       2.       The Defendants Mislead Investors and the Market in Order to Secure the Funding Necessary to Continue the Company's Operations...................................................................................56

   C.     Defendants Were Financially Motivated to Maximize the Trading Price of Star Scientific Securities Given Their Stock, Option, and Warrant Holdings ....................................................................................60

IX.    FRAUD-ON-THE MARKET AND THE PRESUMPTION OF RELIANCE ................ 63

X.     NO STATUTORY SAFE HARBOR ............................................................ 64

XI.    CLASS ACTION ALLEGATIONS ............................................................ 65

XII.   COUNT I – AGAINST DEFENDANTS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 ...................................... 68

XIII.  COUNT II – AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT ............................................ 69

XIV.  PRAYER FOR RELIEF ........................................................................ 69

XV.   JURY DEMAND.................................................................................. 70

Lead Plaintiff Nancy Lopes ("Lead Plaintiff"), by counsel, and for her Consolidated Amended Complaint allege as follows:

## I.      INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Star Scientific, Inc. ("Star Scientific" or the "Company") between May 10, 2011 and January 23, 2013, inclusive (the "Class Period"), against Star Scientific, Rock Creek Pharmaceuticals, Inc. and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").   These claims are asserted against Star Scientific, Rock Creek and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases and filings with the U.S. Securities and Exchange Commission ("SEC").

2.      Star Scientific manufactures and develops nutritional supplements and cosmetic products.  Over the last two decades Star Scientific has developed and marketed failed product after failed product, resulting in a decade of continuous losses.  In hopes of turning the Company around, defendants have placed all of their "eggs in one basket," focusing all development, marketing, and testing efforts on its Anatabloc® line of nutritional supplements and cosmetic products which are derived from a natural compound that combines vitamins A and D3 with an anatabine alkaloid found in tobacco, tomatoes, potatoes, and eggplant.

3.      Star Scientific promotes Anatabloc as a wonder drug with a number of medical benefits and uses, from curing wrinkles to treating inflammation, Alzheimer's disease, traumatic brain injury, and multiple sclerosis.  The problem, however, is that Star Scientific has never proven any of these substantial claims in clinical trials or received U.S. Food and Drug Administration ("FDA") approval for its products and, as a result, Anatabloc sales have been sluggish to date.

- 1 -

4.     To win over skeptical consumers and investors and keep the Company afloat, defendants launched a marketing ploy in which they conveyed the false and misleading impression that Johns Hopkins University School of Medicine ("Johns Hopkins") was officially and independently sponsoring and carrying out studies of Anatabloc in order to give scientific credibility to its claims about the products' miraculous medical benefits and uses.  Throughout the Class Period, defendants violated the federal securities laws by disseminating false and misleading statements to the investing public regarding Johns Hopkins' official involvement in the clinical testing of Anatabloc, including that:

(a)     Johns Hopkins had officially sponsored and independently conducted a pre-clinical trial designed to evaluate the effect of Anatabloc on animals with inflammation caused by thyroiditis (the "Animal Study") without the involvement or financial support of Star Scientific; and

(b)     Johns Hopkins was officially and independently sponsoring and performing a major clinical trial designed to study the effect of Anatabloc on humans with inflammation caused by thyroiditis (the "Human Study") without the involvement or financial support of Star Scientific.

5.     More specifically, Star Scientific created this materially misleading impression of Johns Hopkins' official involvement in the testing of Anatabloc by (i) touting that the Animal Study "independently funded," conducted "at Johns Hopkins," and led by "Johns Hopkins researchers" Drs. Paul Ladenson ("Ladenson") and Patrizio Caturegli ("Caturegli"); and (ii) publicizing their supposedly independent findings, all without disclosing the material fact that Star Scientific had hired these researchers as paid consultants in connection with the development and testing of Anatabloc.  Prior to the public launch of Anatabloc, defendants

engaged in a promotional tour with Drs. Ladenson and Caturegli, going from conference to conference promoting the findings of the Animal Study and touting their positions at Johns Hopkins to further implant the misleading view that Johns Hopkins was officially involved in the testing of Anatabloc.

6.      Later, Star Scientific misled the public into believing that the follow-up Human Study was also being independently and officially sponsored by Johns Hopkins by: (i) closely linking the two studies together; (ii) highlighting Johns Hopkins and Dr. Ladenson's continuing involvement in testing efforts; (iii) and publicizing Dr. Ladenson's assessment of the study results, once again deliberately failing to disclose that Dr. Ladenson was working as a paid consultant of the Company and that Johns Hopkins had no role in the study whatsoever.

7.      On January 23, 2013, *The Street* exposed the truth, publishing an article entitled "Star Scientific's Made-Up, Misleading Relationship With Johns Hopkins" in which it revealed that Johns Hopkins did not have any official involvement in the testing of Anatabloc and that lead researchers Drs. Ladenson and Caturegli were moonlighting as paid consultants for Star Scientific in connection with the clinical development and testing of Anatabloc.  As a result of this news, the trading price of Star Scientific's common stock immediately dropped by $0.31 per share, closing at $2.33 per share—a one-day decline of nearly 12% on volume of 6.1 million shares.

8.      As set forth in detail below, defendants deliberately misled the public about Johns Hopkins' involvement in the testing of Anatabloc in order to secure the equity financing it desperately needed in order to keep the Company in business.  Entering the Class Period, the Company had recorded eight consecutive years of losses and its financial condition was growing worse, as it would go on to post record losses in 2011 and 2012.  As a result, the Company had

only enough funding to cover its operational expenses for approximately one year as of the commencement of the Class Period.

9.     To attract equity investors, defendants therefore understood it was necessary to boost the market's perception of its only real product, Anatabloc.  But without FDA approval or even any clinical data showing that Anatabloc was effective, defendants needed positive results from an elite academic institution such as Johns Hopkins to provide scientific credibility to its claims about the alleged health benefits of the product.

10.     Defendants also were motivated to mislead investors about Johns Hopkins' involvement in the testing of Anatabloc in order to secure substantial performance-based stock option awards at the end of 2011 that depended on the Company's share price closing above $5 on a single day.  Not coincidentally, when the misleading information concerning Johns Hopkins involvement in, and sponsoring of, the testing of Anatabloc seeped into the market, Star Scientific's stock price rose above $5 for a single day and has not reached that price level since. As a result of this one day spike in the Company's share price, the individual defendants received millions of dollars' worth of stock options.

11.     As detailed below, defendant Jonnie R. Williams, Sr. ("Williams") has a long history of forming start-up ventures like Star Scientific in which he attracts unwary investors by: (i) touting a supposed medical breakthrough product or service without providing any data supporting its effectiveness; (ii) pumping up the stock price by making fraudulent or exaggerated claims about the product or services being offered; (iii) engaging in unethical business practices; and (iv) relying on, and often taking advantage of his personal and academic connections— particularly with respect to Johns Hopkins.  In fact, both the SEC and the Massachusetts Securities Division have filed securities fraud actions against defendant Williams in the past and

have levied substantial fines against him for orchestrating a fraudulent marketing scheme to pump up the price of his company's stock. His prior business practices that mirror his actions here further demonstrate that he was aware of the false and misleading nature of the Company's statements about Johns Hopkins' involvement in the testing of Anatabloc and, therefore, knowingly violated the Exchange Act.

12. Since the end of the Class Period, it has come to light that defendants, and in particular defendant Williams, have engaged in other potentially fraudulent misconduct. For example, it was revealed in an April 1, 2013 *Washington Post* article that defendant Williams had furnished financial support to the Virginia Governor and his wife seemingly in exchange for their promotion of the business, which arrangement defendant Williams had concealed from the public. The First Lady of Virginia had played a crucial role in promoting the product, endorsing the use of Anatabloc at a number of investor and scientific conferences, hosting the Anatabloc launch party at the Governor's mansion, and publicly proclaiming that the compound could be used to lower the health costs in Virginia. In addition, on March 18, 2013, Star Scientific disclosed in its 2012 Annual Report on Form 10-K filed with the SEC ("2012 10-K") that the Company had received subpoenas from the U.S. Attorney's Office concerning potential fraud related to the Company's private placement offerings between 2006 and 2013 and that an investigation with respect to those claims was ongoing.

13. As a result of defendants' false and materially misleading statements and omissions, Lead Plaintiff and the proposed class acquired Star Scientific securities at artificially inflated prices during the Class Period (the "Proposed Class") and subsequently suffered significant losses as a direct result of the precipitous drop in the Company's stock price following

the truth concerning those false and materially misleading misstatements being made public in January of 2013.

## II.  JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by the SEC.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this District pursuant to section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.  Venue is proper in the Richmond Division pursuant to Local Civil Rule 3.

16.     Star Scientific maintains its principal executive offices at 4470 Cox Road, Suite 110, Glen Allen, Virginia.  Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

17.     In connection with the acts alleged in this Consolidated Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES

18.     Lead Plaintiff Nancy Lopes purchased the publicly traded securities of Star Scientific during the Class Period as set forth in the certification attached hereto and was damaged as the result of defendants' wrongdoing as alleged in this Consolidated Amended Complaint.

19.     Defendant Star Scientific is a specialty pharmaceutical company engaged in the development, manufacture, and marketing of bio-equivalent pharmaceutical products in addition to the development of branded products.

20.     Defendant Rock Creek is a wholly-owned subsidiary of Star Scientific. Defendant Rock Creek currently manufactures and sells two nutraceutical dietary supplements designed to promote the maintenance of a healthy metabolism: Anatabloc, for anti-inflammatory support, and CigRx®, for assistance in fighting the urge to smoke cigarettes.

21.     Defendant Paul L. Perito ("Perito") is, and at all relevant times was, the Company's President, Chief Operating Officer ("COO") and Chairman of Star Scientific's Board of Directors (the "Board").  Defendant Perito is also Rock Creek's Chairman and Chief Executive Officer ("CEO").

22.     Defendant Williams is, and at all relevant times was, Star Scientific's CEO.

23.     Defendant Park A. Dodd, III ("Dodd") is, and at all relevant times was, Star Scientific's Chief Financial Officer ("CFO").

24.     Defendant Curtis Wright ("Wright") is, and at all relevant times was, Rock Creek's Senior Vice President and Medical/Clinical Director.

25.     The defendants named above in ¶¶21-24 are referred to herein as the "Individual Defendants."

26.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Star Scientific's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.   BACKGROUND

### A.   Defendant Williams' Prior Business Ventures

27.    Defendant Williams started out as a car salesman and real estate agent in Fredericksburg, Virginia. According to a December 30, 1988 *Boston Globe* article entitled, "The Selling of Scientific Promises Problems Arise as Line is Blurred Between Business, Biomedicine," defendant Williams established himself as "one of the best salesmen" in his hometown, selling more cars for the local Ford dealership and more homes for a local real estate office than any salesman before him. Defendant Williams matriculated in a master's program at Johns Hopkins School of Advanced International Studies in Baltimore, Maryland, in the late 1970s. He dropped out soon after enrolling, but not before he made a valuable business contact in Frank E. O'Donnell, Jr. ("O'Donnell"), a then-medical resident in ophthalmology at the prestigious Wilmer Eye Institute at Johns Hopkins. Despite having no formal medical or scientific education or training himself, defendant Williams partnered with O'Donnell on a series of medical-related business ventures over the next three decades. His main business asset, perhaps his only one, was his smooth talking salesmanship. According to a July 1, 2013 *Bloomberg* article entitled, "Williams Microwaved Tobacco Before FBI McDonnell Probe," David Muller, the founder of Summit Technology, a business competitor, described him as a "very slick salesman ... who could sell snowballs in Alaska." According to the *Boston Globe*

article, an ex-employee of one of defendant Williams' business ventures echoed this view of defendant Williams, describing him as such a good salesman, "he could sell a snowball to an Eskimo … [b]ut when it comes to backing up what he was selling, now that was another story."

28.     Relying on their aggressive promotional skills, defendant Williams and O'Donnell followed a similar script in nearly each of their businesses in which they: (i) took a medical-related product or service and billed it as a medical breakthrough without providing any reliable evidence that it worked as promised; (ii) pumped up the stock price by making fraudulent or exaggerated claims about it, often engaging in unsavory business practices, and relying on, and often taking advantage of, their academic connections, particularly to Johns Hopkins, to attract investors; (iii) paid themselves generous salaries and stock options out of the stock proceeds from the offerings; and (iv) eventually sold off their shares to reap substantial gains leaving the company to go out of business.

29.     Defendant Williams' first business venture was as the owner of Colonial Opticians ("Colonial"), an optical shop that sold and fitted customers for eyewear.  He tapped into his Johns Hopkins connections by hiring O'Donnell to examine patients at Colonial despite it being a violation of a Johns Hopkins policy against residents taking a second job.  Defendant Williams' business soon thereafter ran afoul of a local regulation, receiving a fine from a local court for fitting customers with glasses without a license.  While defendant Williams personally profited from Colonial, he did not manage it well, running up substantial debt, which eventually forced him to abandon Colonial in 1980.

30.     In 1983, he teamed up with O'Donnell to form CME-SAT Inc. ("CME-SAT"), a public company that produced training videos for medical specialists.  By this time, O'Donnell was the head of ophthalmology at St. Louis University, and the two relied upon his university

connections, primarily at Johns Hopkins, to get the venture off the ground.   Based on an understanding that the start-up company was to be a non-profit entity, Johns Hopkins and other prestigious institutions like the Harvard-affiliated Beth Israel Hospital had provided significant resources and cooperation to CME-SAT, including: (i) providing leading doctors to give on-air lectures for small honorariums; (ii) permitting the use of their video studios to produce the videos; and (iii) granting academic credit to university doctors for watching the instructional videos.   After securing their support, defendant Williams and O'Donnell took CME-SAT public, selling over $2 million of stock by promoting CME-SAT's ties to leading universities and doctors and selling the stock to administrators and professors at these universities.   Once again, defendant Williams and O'Donnell proved better at promoting the business than managing it, as CME-SAT racked up continuous losses and survived only as a result of repeated stock offerings. Defendant Williams and O'Donnell paid themselves handsome salaries and bonuses from these stock proceeds.   Believing that they had been taken advantage of, administrators and professors at Johns Hopkins, St. Louis University, and other universities withdrew their support and threatened legal action against defendant Williams and O'Donnell for among, other things, having failed to pay for services and resources provided and having misled them into believing their work would not be used for profit.   As a result of the straining of these relations and defendant Williams and O'Donnell's mismanagement of the public company, CME-SAT's financial condition grew worse, even as defendant Williams and O'Donnell continued to pay themselves substantial salaries and bonuses and pay for personal expenses with company funds. Sensing the end was near, in early 1985, the pair dumped nearly all of their CME-SAT stock, raking in at least $1.2 million, and quit the company.   CME-SAT filed for bankruptcy shortly

thereafter.   According to bankruptcy filings, among CME-SAT's creditors was Johns Hopkins, which claimed a debt of over $100,000 for providing unpaid resources and services.

31.     Even before formally departing from CME-SAT, defendant Williams and O'Donnell had moved on to their next venture, teaming up with O'Donnell's mentor Dr. A. Edward Maumenee ("Maumenee"), a former Chairman of Ophthalmology at Johns Hopkins, to start a new company called Spectra Pharmaceuticals Services Inc. ("Spectra").   The new business sold a vitamin A ointment that it promoted as a miracle cure for a wide range of ailments, including eye diseases and wrinkles.   The ointment had been "discovered" by Scheffer C.G. Tseng ("Tseng"), a former Johns Hopkins researcher and colleague of O'Donnell and Maumenee, who had performed only a small initial study (consisting of approximately twenty subjects). Defendant Williams and O'Donnell bought off Tseng by granting him a significant stake in Spectra and a generous consulting fee in exchange for the rights to the ointment and the right to use his Johns Hopkins credentials and limited research to promote the product to investors. Despite the limited testing of the product and the lack of independent corroboration, defendant Williams was able to successfully pitch Spectra to investors by hyping it as a medical breakthrough product and by relying (once again) on his business partners' impressive academic credentials and ties to Johns Hopkins.   Spectra held an initial public offering in 1985, in which it immediately sold $3 million worth of shares, and Spectra's share price quickly skyrocketed from $2 a share to nearly $8.   Further testing performed at Johns Hopkins and the Harvard-affiliated Massachusetts Eye and Ear Infirmary revealed that the product did not work as promised, as a cure-all ointment for eye diseases.   It appears, however, Spectra did not timely or adequately disclose the adverse results of these studies.   In fact, according to a *Boston Globe* article, records show that for two years prior to disclosing the results of the Harvard-affiliated study, Spectra had

concealed data results showing the ointment was ineffective.  During this period, Spectra had issued stock in the amount of $1 million and had continued to falsely promote it as a wonder ointment and tout Spectra's connections to Johns Hopkins.  The resulting firestorm sparked internal investigations by these institutions, and a shareholder class action suit, regarding whether the research was properly supervised and whether the results had been distorted or delayed.

32.     To boost the stock price again, defendant Williams resorted to even more egregious and illegal promotion tactics.  According to federal and state actions later filed against defendant Williams, he paid Florida financial research reporter Robert Baker to write a putatively independent research report to investors touting Spectra's university ties and falsely claiming that the FDA was close to approving the ointment, that it could cure dry eye and make wrinkles go away (when, in fact, studies had shown that it was ineffective for these uses), and making unreasonable projections about Spectra's future profits. Also, according to the state action complaint, while engaging in this fraudulent publicity campaign, defendant Williams was secretly buying the stock at below market rates and then selling all of his stock for more than $1 million in proceeds before abandoning the business in the summer of 1987.  The SEC and several state securities divisions filed actions against defendant Williams for his illegal and fraudulent conduct, resulting in a $100,000 fine by the Massachusetts Securities Division and a court order to repay defrauded investors nearly $300,000, and a settlement with the SEC requiring defendant Williams to disgorge nearly $300,000 of his fraudulent gains.  Like all of his previous businesses, Spectra subsequently went bankrupt.

33.     At the same time they were running Spectra into the ground, defendant Williams and O'Donnell co-founded another start-up company called LaserSight Inc. ("LaserSight") that

claimed to have developed cutting edge lasers for eye surgery.  LaserSight boasted that it had invented four breakthrough lasers for innovative medical eye applications and that they would be able to gain FDA approval fairly quickly, claims which were widely refuted within the industry and, in fact, never came to fruition.  In fact, one industry competitor stated that "basic physics and engineering constraints" would make it impossible to build the type of laser LaserSight claimed to have built and accused the company of "[lying] to pump [its] stock." Defendant Williams and O'Donnell took LaserSight public and cashed out their shares soon thereafter, leaving LaserSight to later go bankrupt.  The SEC later filed an action against LaserSight and one of defendant Williams' former partners alleging that they had orchestrated sham transactions to divert LaserSight funds to themselves, which resulted in a SEC judgment against them.

34.  Despite the multitude of regulatory investigations and sanctions plaguing their prior businesses, defendant Williams and O'Donnell were not deterred, and started a new company called C.A. Blockers Inc. ("C.A. Blockers") that also claimed to have developed a breakthrough product—cigarettes without any cancer-causing toxins.  Following their past modus operandi, defendant Williams and O'Donnell promoted their "touted as safe" LungGuard cigarettes by relying on university connections and making exaggerated, unsubstantiated claims based on limited testing.  They took C.A. Blockers public, bringing in proceeds of $3 million from the initial public offering.  Pursuant to an April 2, 1998 *Streetsweeper* article, in April 1989, the FDA ordered the LungGuard cigarettes off the market after debunking C.A. Blockers' claim that the cigarettes were "safer" and "block[ed] the actions of known carcinogens found in cigarette smoke."  C.A. Blockers subsequently filed for bankruptcy.

### B.    Formation of Star Scientific

35.  In 1990, defendant Williams and O'Donnell bought the remaining assets of the bankrupt C.A. Blockers and repackaged it as a company named Star Tobacco, Inc. ("Star

Tobacco") (which he later operated under its current name of Star Scientific) that also developed supposedly cancer-safe cigarettes.  At the outset, defendant Williams served as the COO and Executive Vice President of Star Tobacco, but later became the CEO after the company began operating as Star Scientific.  For decades, the major tobacco companies had been looking for a tobacco-curing process that did not produce cancer-causing toxins, but despite the multi-million dollar research and development budgets and assistance of leading academic researchers, they had failed in this endeavor.  Despite lacking any formal scientific or medical education or training himself, defendant Williams came up with the idea, on a apparent hunch, of using microwaves to cure cigarettes.  Through this method, defendant Williams claimed to have developed a completely safe cigarette—a claim which was refuted by the FDA—falsely testifying at trial in a later action between Star Tobacco and cigarette manufacturer R.J. Reynolds Tobacco Co. ("RJR"): "I have eliminated carcinogens from the curing barn."

36.     Like in each of their prior business ventures, defendant Williams and O'Donnell relied on their university connections to promote their new start-up company.  Also, as in their previous businesses, defendant Williams solicited the acceptance of the academic world by, according to court documents in the RJR trial, paying a leading university researcher in the field substantial sums to conduct supposedly independent studies showing it to be safe.  This paid consultant, a professor at the University of Kentucky, was effusive in his praise, claiming that tests showed that defendant Williams' tobacco products had removed more than 99% of carcinogens.  Independent experts disagreed. So too did the FDA, which refused to permit Star Tobacco to promote its brand of cigarettes as "safe."  And so defendant Williams focused instead on convincing the major cigarette companies to buy Star Tobacco's cigarettes or license the technology, but without providing reliable evidence substantiating his claims.  Chris Coggins, a

- 14 -

former Vice President at the cigarette manufacturer Lorillard, Inc. described defendant Williams' sales pitch thusly: "[Williams] had a process that was advertised beyond belief as the magic bullet that would cure everything…. He never came up with any data."

37.     For years, Star Tobacco (later as a wholly-owned subsidiary of Star Scientific) manufactured cigarettes for other companies in addition to offering its own brand of cigarettes called Advance®.  Star Scientific also attempted to produce a tobacco-laced gum as a safe alternative to smoking, but the FDA found that it was unsafe due to carcinogens that formed during curing. Star Scientific's revenue peaked in 2001 and after its contract with Brown and Williamson Tobacco Corporation was canceled in 2003, its cigarette business steadily declined until Star Scientific shut it down in 2007.  That year, Star Scientific shifted its focus to the development of two supposedly low carcinogenic smokeless tobacco products—Ariva® and Stonewall Hard Snuff®.  But like the others, these also failed to gain any market traction, causing the Company's finances to further deteriorate along with its trading price.  Finally at the end of 2012, the Board decided to discontinue the manufacturing and distribution of its smokeless tobacco products altogether, citing to "continued losses and low sales" and their inability to effectively market them as safer tobacco alternatives due to the enactment of "the Family Smoking Prevention and Tobacco Control Act of 2009, or FDA Tobacco Act."

38.     Star Scientific brought a lawsuit against RJR in 2001 alleging the major cigarette maker had infringed Star Scientific's tobacco curing patents.  Once again creating outsized, unfulfilled expectations for investors, Star Scientific repeatedly stated it was in line to obtain a massive damages award from RJR.  Defendant Perito, the then COO, claimed in a November 21, 2008 interview that the Company could be awarded as much as $1 billion in damages.  Instead, the Company suffered legal defeat after legal defeat during the protracted litigation.  In 2008, the

U.S. District Court for the District of Maryland dismissed Star Scientific's patent claims based on its finding that its patents were unenforceable due to its inequitable conduct.  According to court documents from that action, the court found, based on evidence presented at trial, that defendant Williams and others at Star Scientific had deliberately misled the U.S. Patent and Trademark Office ("PTO") by concealing evidence known to defendant Williams that showed the curing process Star Scientific sought to patent was not new.  Defendant Williams, who testified at the trial, was widely viewed as lacking in credibility.  Equity analyst Elliot Favus, of Favus Institutional Research, LLC, who observed the trial, stated that defendant Williams made a number of wild, exaggerated claims during his testimony, including making a false statement about his longtime business partner's relationship to Johns Hopkins.  In his report, Mr. Favrus stated in part:

> **In our view, there were several bizarre moments in court today**.  At one point in his testimony, playing the role that many institutional investors know and love, Mr. Williams proclaimed, "I have eliminated carcinogens from the curing barn." This was not his first sensational comment on the witness stand in this case. Yesterday, he incorrectly referred to one of his business associates, Dr. Frank E. O'Donnell, Jr., as, "the Dean of Johns Hopkins University," when according to our research, Dr. O'Donnell never rose higher than being a resident in Opthalmology[sic] at the Wilmer Ophthalmological Institute at Johns Hopkins University.

39.     Later, the United States Court of Appeals for the Federal Circuit overturned the district court's order dismissing Star Scientific's claims on the ground that the evidence demonstrating Star Scientific's inequitable conduct was not quite compelling enough to meet the highly stringent clear and convincing standard.  The case returned to the district court, where RJR once again prevailed, with the jury denying each of Star Scientific's claims, finding that the patent was not valid and regardless of whether it was, no infringement had occurred.

40.     Star Scientific's hopes for a substantial award from RJR were briefly revived when the PTO confirmed the validity of the disputed patents in early 2011.  In an incredible

display of timing, the seemingly prescient defendant Williams profited greatly from this positive development.   Only a week before the announcement, with the Company's share price floundering at less than $2 per share, defendant Williams had purchased approximately $1 million worth of shares (over 500,000 shares for $1.96 per share).   The Company's share price skyrocketed to nearly $5 per share following the announcement of the legal victory, resulting in the value of the timely stock purchase more than doubling.   Star Scientific's legal victory was short-lived though, as Star Scientific and RJR later settled their suit for the small sum of $5 million, substantially less than the amounts Star Scientific had initially led investors to believe it would recover from RJR.

C.      The New Star Scientific

41.      After striking out in the cigarette and smokeless tobacco businesses, Star Scientific reinvented itself as a company that produces nutritional supplements and cosmetic products.    In 2007, Star Scientific established subsidiary Rock Creek to focus on the development, manufacture, sale, and marketing of so-called "nutraceutical" dietary supplements and cosmetic products derived from certain alkaloids found in the Solanaceae family of plants, which includes potatoes, tomatoes, and eggplants.   Nutraceuticals are foods or food-derived products meant to provide health benefits.   Unlike pharmaceutical drugs, nutraceuticals are not subject to rigorous clinical testing requirements and regulations, and therefore can be brought to market quickly and easily, without formal regulatory approval and without any evidence showing they are effective.

42.      The first dietary supplement developed by Star Scientific was CigRx, which was developed in 2009 to temporarily reduce the urge to smoke.   Since being introduced into the market in August 2010, CigRx has been a complete flop, recording only "de minimis" sales, according to Star Scientific's SEC filings.   As a result, Star Scientific is not actively marketing

the product, primarily selling it through its website and a few retail outlets in Richmond, Virginia.

### D.    Star Scientific's Deteriorating Financial Picture

43.    Due to the string of product failures, Star Scientific's financial condition grew increasingly worse, as it continued to post ever increasing losses.  By 2011, as noted in the Company's 2010 Annual Report on Form 10-K filed with the SEC on March 16, 2011 (the "2010 10-K") the Company had "incurred operating losses for eight consecutive fiscal years" and was expected to incur "operating expenses … greater than operating revenues for the foreseeable future."  The Company would continue to struggle in 2011 and 2012, posting record operating losses of $28.3 million and $38 million in fiscal years 2011 and 2012, respectively, leaving the Company with an "accumulated deficit as of December 31, 2012 [of] approximately $231.5 million" according to Star Scientific's 2012 Amended Annual Report on Form 10-K/A filed with the SEC on April 30, 2013 (the "2012 10-K/A").  In light of these mounting losses and its eventual termination of its tobacco business, the Company slashed its work force, cutting the number of full time employees from thirty-nine to just twenty-three in 2012—an astounding one-year decrease of over 40%.  Due to its struggles, Star Scientific's stock price sunk so low (to $0.50), it received a delisting warning from the NASDAQ Stock Market ("NASDAQ") in late 2009 and was not able to raise its stock price above the requisite $1.00 per share price until March 2010.

### E.    Launching of Anatabloc

44.    As a result, Star Scientific desperately needed to hit a "home run" with its next product offering in order to keep the Company afloat.  Its next product was RCP-006 (later sold under the brand name Anatabloc), which is a natural compound that combines vitamins A and D3 with an anatabine alkaloid found in the tobacco plant and other members of the Solanaceae

family of plants.   In keeping with defendant Williams' prior practices, the Company billed Anatabloc as a miracle supplement, with a variety of medical benefits and uses, ranging from inhibiting inflammation to treating a number of ailments, including Alzheimer's disease, traumatic brain injury, ulcers, diabetes, and multiple sclerosis.

45.   Desperate to bring in revenue after posting negligible sales (only $418,000) for the first half of 2011, Star Scientific launched the Anatabloc dietary supplement in August 2011, even though it had yet to achieve any clinical results showing Anatabloc was effective. As disclosed in Star Scientific's 2011 Annual Report on Form 10-K filed with the SEC on March 15, 2012 ("2011 10-K"), to win over skeptical investors and consumers, the Company focused nearly all of its marketing efforts on the sale of its Anatabloc dietary supplement and face cream, which it later introduced as an antidote for wrinkles.   As detailed below, with his company in an increasingly precarious position, defendant Williams, as he had done with his prior businesses, launched an aggressive and fraudulent marketing scheme in which the Company conveyed the misleading impression that an elite medical institution (Johns Hopkins) was independently and officially conducting tests on Anatabloc.   In addition, defendant Williams plied the putatively independent endorsement of the Virginia Governor and his wife with substantial gifts, hired a number of professional athletes to also endorse the product, and sold the product through both its website and GNC stores nationwide.

**F.    Star Scientific's Collaboration with the Roskamp Institute in Testing Anatabloc**

46.   Prior to launching Anatabloc, Rock Creek had teamed up with the Roskamp Institute to conduct research on the product.   In an April 7, 2010 press release, Star Scientific announced that it had entered into a research and royalty agreement with an affiliate of the Roskamp Institute, SRQ BIO, LLC (collectively with the Roskamp Institute, "Roskamp") to

conduct research on Anatabloc for a variety of neurological conditions, including Alzheimer's disease.   Under the agreement, Roskamp would receive royalties in the amount of 5% of Anatabloc sales and 100,000 shares of Company stock (valued at $272,000).   In addition, as disclosed in the aforementioned press release and the Company's subsequent SEC filings, Roskamp founder and trustee Robert Roskamp became a significant investor in Star Scientific, purchasing approximately 769,230 shares (valued at $1 million) and received an equal number of warrants exercisable at $1.50 per share.   Robert Roskamp subsequently purchased another 254,452 shares and 254,452 warrants with an exercise price of $4 per share in 2011.

47.     Throughout 2011 and 2012, Rock Creek and the interested Roskamp conducted and reported on a few clinical and preclinical trials designed to assess the effect of Anatabloc on inflammation and other ailments.   The Company publicly reported that the results of these studies were positive, but failed to disclose any data supporting the supposedly positive results. In the so-called Flint Study, in which Roskamp tested the effect of Anatabloc on individuals with chronic inflammation, the Company announced widely different results two days apart (claiming at first 26% of the subjects experienced a positive effect, then claiming later it was 61%), a significant discrepancy which called into question the results of the study and all others performed by Roskamp.   Not surprisingly, given the inconsistent reporting of the results of its studies, Roskamp's obvious conflict of interest and the lack of prestige attached to Roskamp's name, the market reaction to the Company's announcements about the Roskamp studies was largely muted.

### G.     Virginia Governor's Promotion of Anatabloc

48.     Ahead of its launch of the product, Star Scientific embarked on a national promotional tour, in which defendant Williams enlisted the assistance of his political friends and paid consultants who were employed by Johns Hopkins (discussed in detail below) to promote

the unproven Anatabloc.  The first stop was a June 1, 2011 conference at Roskamp, which was attended by scientists and institutional investors alike.  At the conference, defendant Williams introduced the First Lady of Virginia, Virginia Governor Robert McDonnell's wife, Maureen.  In her speech, Mrs. McDonnell expressed her full support for Anatabloc, stating that the product could be used to lower health care costs in Virginia and around the country, and in a grand, pre-staged gesture, publicly offered the Executive Mansion to host the upcoming launch party. According to one investor who attended the event, her speech "wowed attendees."  Over the next several months, Mrs. McDonnell attended numerous events in which she publicly endorsed Anatabloc.

49.    Star Scientific capitalized on the positive press generated from the First Lady of Virginia's public endorsement by holding the launch party at the Virginia Governor's Executive Mansion, which was announced in a Company press release dated August 30, 2011.  The Governor and his wife hosted and attended the event and their presence gave the Company a real boost.  According to John Clore, a professor at the Virginia Commonwealth University School of Medicine, who attended the event, "It was an event that was designed to make a big splash…. That was the week it was showing up in stores."

50.    Defendant Williams used his connections to the McDonnells and the First Lady's public endorsement of the product to gain access to top state officials to promote his product.  He met with the Virginia Health Secretary and a top official from Virginia Department of Health and Human Resources where they discussed how Anatabloc could be used to lower health costs among state employees.  As defendant Williams' attorney and former Virginia Attorney General acknowledged, the Company benefited greatly from the McDonnells' support.  In an April 1, 2013 article from *The Washington Post*, the Virginia Attorney General stated "I think with any

Virginia product, it's helpful to have support from the governor.  In any state, it is helpful to have a governor's support."

51.     Unbeknownst to the public, defendant Williams may have bought McDonnells' public support of Anatabloc.  The April 1, 2013 *Washington Post* article, along with subsequent articles, revealed the truth about the lavish financial support defendant Williams had funneled to the McDonnells possibly in return for their promotion of Anatabloc.   Among other gifts, defendant Williams: (i) had donated nearly $80,000 worth of air travel to Governor McDonnell for his 2009 gubernatorial campaign and during his recent term in office; (ii) provided nearly $10,000 worth of food, lodging, transportation, and entertainment from the Company and defendant Williams in 2011 and 2012; (iii) paid for nearly $15,000 in catering costs for the June 2011 wedding of the McDonnells' daughter and another $10,000 to help pay the expenses of their other daughter's wedding in 2013; (iv) flew Mrs. McDonnell to New York in the spring of 2011 and treated her to an expensive shopping spree consisting of $15,000 worth of clothes; (v) used Star Scientific's corporate jet to fly Mrs. McDonnell around to each of the stops on Star Scientific's national promotional tour; and (vi) bought a $6,500 Rolex watch for Mrs. McDonnell to give to the Governor.

**H.     Star Scientific's Scheme to Falsely Promote Johns Hopkins as Being Involved in Studying Anatabloc**

52.     Although Star Scientific had already enlisted the financially interested Roskamp to perform research, it needed the imprimatur of an independent, elite academic institution to give scientific credibility to the significant claims being made about Anatabloc's potential medical benefits and to generate excitement among consumers and investors alike.  As a result of his experience with prior businesses, defendant Williams well understood that, because of its sterling reputation within the medical and scientific communities and among the public, Johns

Hopkins' association with the testing of an unproven product like Anatabloc would give it instant scientific credibility.  After all, Johns Hopkins is consistently ranked as one of the top medical institutions in the United States.  Turning to the institution he had relied upon to pump up many of his previous businesses, defendant Williams hired Dr. Ladenson, chief of the Johns Hopkins divisions of Endocrinology and Metabolism and Dr. Caturegli, also a professor in the Pathology department of Johns Hopkins, to moonlight as paid consultants in connection with the clinical development and testing of Anatabloc.  But defendants did not disclose at the time of the hiring (or any time since) that Drs. Ladenson and Caturegli had been retained as paid consultants for the Company, or when this relationship began or what the financial terms of the arrangements are.

### 1.      The Animal Study

53.      In 2011, Star Scientific's hired guns Drs. Ladenson and Caturegli, who are also professors at Johns Hopkins, conducted the Animal Study to test the effect of anatabine on mice with thyroiditis, which is a disease marked by inflammation of the thyroid gland.  Star Scientific and its affiliates provided crucial advice and financial support to the Animal Study by: (i) providing the anatabine used in the study; and (ii) allowing the same Roskamp researchers who were conducting trials for Star Scientific to provide key guidance and advice to the researchers.

54.      Star Scientific did not disclose its financial relationship with the lead researchers of the Animal Study or that its research partner and equity holder Roskamp had provided key guidance and financial support to the study.  Instead, the market was misled into believing that Johns Hopkins was officially and independently sponsoring this and a number of other studies designed to test Anatabloc.  In an April 29, 2011 *Seeking Alpha* article by investor Dr. John Faessel, he touted the promise of the drug based on Johns Hopkins' supposedly substantial involvement in clinical testing of it, stating in relevant part:

- 23 -

A proprietary Star Scientific compound is now being tested on humans at ... Johns Hopkins University School of Medicine .... Because of the astonishing success of the Star Scientific compound in encouraging new neuronal cell growth and reducing B-amyloid at the cellular level, Johns Hopkins University—a major research institution—is phasing in new uses of the compound in several other disease venues: cancers, thyroid, arthritis, and other diseases ... research at the Johns Hopkins suggests that a low grade inflammation in pregnant women can pass through the placenta and blood-brain-barrier and cause aberrant neuronal growth within the fetal brain that could lead to autism and other disorders of presumed neurodevelopment origin, like schizophrenia and cerebral palsy .... Now we see that Mr. Sharp is a new board member of Star Scientific (March 17, 2011). Let it be said again: Star Scientific makes the product the Roskamp Institute uses for its Alzheimer studies .... Mr. Sharp is a member of the Johns Hopkins Medicine Board of Advisors, so he must have been aware of the Johns Hopkins involvement with the testing of Star's anatabine/RCP006 compound.

Following this report about Johns Hopkins' putative participation with the development and testing of Anatabloc, the share price of Star Scientific immediately shot up by 11%, from $3.62 to $4.01 and soon thereafter climbed above $5 based on the market excitement of this announcement that Johns Hopkins was officially sponsoring clinical testing of Anatabloc.

55.     Except for the fact that Drs. Ladenson and Caturegli were employed as professors by Johns Hopkins during this time, the university did not have any official involvement in the Animal Study, as reflected by the later published January 23, 2013 article by *The Street* entitled, "Star Scientific's Made-up, Misleading Relationship with Johns Hopkins," which stated that "Johns Hopkins has no official involvement with Star Scientific or anatabine."

56.     Nevertheless, Star Scientific did nothing to debunk this misleading notion that Johns Hopkins was officially and independently involved in clinical testing of Anatabloc, and instead perpetuated this deception on the market.  In a number of press releases, Star Scientific touted the positive results of the Animal Study and quoted Dr. Ladenson for his conclusions about it without disclosing that it had an ongoing financial relationship with him and the other lead researcher who had performed the Animal Study.  More specifically, the Company reported

the results of the Animal Study as wholly positive, describing them as "impressive" based on the researchers' supposed findings that anatabine lowered the incidence and severity of thyroiditis.

57.     The paid consultants also whole-heartedly endorsed Anatabloc at every stop on Star Scientific's promotional tour of Anatabloc, alongside defendant Williams and the First Lady of Virginia, during the summer and fall of 2011.  Dr. Ladenson and Caturegli expressed high praise for Anatabloc despite not even knowing either how the supplement worked or its effect on humans.  At a scientific conference held in Newport Beach, California, on October 27, 2011, in which Dr. Ladenson presented his findings, in response to a pointed question asking the mechanism of the action, he admitted that "they didn't know yet."  At each of these medical and investor conferences, Drs. Ladenson and Caturegli, in touting the results of the Animal Study and the potential benefits of the drug, also gave the misleading impression to investors and doctors they had conducted these studies on behalf of Johns Hopkins.  For example, at the June 1, 2011 conference attended by myriad leading scientists and investors, one attending investor, Dr. Faessel, described their presentation in a published report entitled, "Dr. Faessel – Report from the Roskamp Meeting in Sarasota, Florida" dated June 2, 2011, thusly:

> Two prominent Johns Hopkins University researchers also presented, renowned endocrinologist Dr. Paul Ladenson and internationally known Dr. Patrizio Caturegli.  They seemed like they were about ready to jump thru their very reserved demeanor when they spoke to their research on Anatabine in thyroiditis etc.  Johns Hopkins is doing research using anatabine/ (RCP-006) on gastroenterology, rheumatology, cancer, auto immune diseases (lupus), cardio atherogenesis (the developmental process of atheromatous plagues in arteries) and other conditions too.
>
> Significantly, Dr. Ladenson added that there was no known compound that stops thyroiditis except anatabine (RCP-006).
>
> I was told that Dr. Ladenson used the term, astonishing when he spoke recently about (RCP-006).  Supposedly, his wife says that astonishing is a word he doesn't use.

58.    Upon the publication of Dr. Faessel's report from the Roskamp conference publicizing Johns Hopkins' supposed involvement in and independent endorsement of Anatabloc, Star Scientific's share price immediately jumped up from $4.22 to $4.73 per share, an increase of 12%.

59.    On behalf of Star Scientific, defendant Williams also attended this promotional event for Anatabloc, held at Roskamp.  But neither at the conference nor in any subsequent press releases or SEC filings did defendant Williams or the Company correct the misleading impression that had been conveyed to the market that Johns Hopkins was officially and independently sponsoring a number of studies of Anatabloc without the involvement of Star Scientific.  In fact, rather than set the record straight, Star Scientific perpetuated this false relationship by putting out a number of press releases starting in the fall of 2011, timed to coincide with the introduction of Anatabloc into the market, and continuing into 2012, touting the positive results of the tests performed by, as Star Scientific referred to them, "the independently funded research team at Johns Hopkins."

60.    According to an *Richmond Times Dispatch* article, dated September 1, 2013, entitled "McDonnell Said to be Aware of Gifts from Star CEO," Dr. Ladenson's patronage to Star Scientific even extended to assisting defendant Williams in lobbying Governor McDonnell's support for Anatabloc. According to people familiar with an ongoing criminal investigation of defendant Williams' financial support to Governor McDonnell, defendant Williams arranged an "all expenses paid" trip, using Star Scientific funds, for the Virginia Governor and his wife to Cape Cod as part of "a campaign by Williams to sell the governor and other top state officials on his company's new dietary supplement, Anatabloc" in 2012.  Defendant Williams brought Dr. Ladenson along to help him in making the sales pitch.

### 2.   The Human Study

61.   In 2012, Star Scientific initiated a major trial designed to investigate the effects of a nutritional supplement containing Anatabloc on humans with thyroiditis.  In what it billed to be a follow-up study to the earlier Animal Study, Star Scientific retained Drs. Ladenson and Caturegli as lead consultants on the Human Study, but again failed to disclose that they were acting in the capacity of a paid consultant rather than on behalf of Johns Hopkins in connection with the study.  And in a number of press releases, Star Scientific reported that this latest study was a natural extension of the previous one and closely linked the two studies together, touting the academic credentials of Drs. Ladenson and Caturegli, and including quotes from Dr. Caturegli about his purported independent conclusions about the Human Study, to give the public the misleading view that Johns Hopkins was officially involved in this study as well.

62.   Based on this misleading information, investors and equity analysts alike viewed the release of the results of the Human Study as the key milestone for Star Scientific because if positive, they would bring instant scientific credibility to an unproven product.  For example, in his August 1, 2012 report, Otis Bradley ("Bradley"), an analyst with Gilford Securities Inc. ("Gilford") stated that "the most important short-term announcement ... will be the release from [Johns] Hopkins of its test findings of the effectiveness of Star [Scientific's] Technology upon Thryoid Diseases" and that "It is our opinion that release of the [Johns] Hopkins' test results using Star [Scientific's] Anatabloc technology for treatment of thyroid diseases will be particularly important to [Star Scientific] performance near term."  He echoed that sentiment in a number of other reports throughout 2012.  In a January 2, 2013 report, published just days before the release of the interim results of the Human Study, Bradley continued to proclaim how monumental this study was to Star Scientific's value based on its supposed sponsorship by Johns Hopkins.  He stated that the Human Study "will be the most important event in Star [Scientific's]

History."  In an October 9, 2012, *Seeking Alpha* report, Dr. Faessel echoed this view, stating that the "Star Scientific landscape will change dramatically as Johns Hopkins is about to release their nine city study on the effects of Anatabine/Anatabloc on thyroid disease," and that "[t]here [was] much riding on these scientific findings."  He went on to state that "a positive report [from the Human Study] could/would be a defining moment/tipping point" for Star Scientific and would "validate the science and garner significant world-wide press."

63.    The reason investors and consumers placed so much importance on the results of this Human Study was that the Johns Hopkins name carries significant weight within the scientific and medical communities and among the public, and its supposed sponsorship of a study showing the drug was effective would provide instant scientific credibility and resonate with consumers and investors.  After all, although the Company had touted Anatabloc as being a potential treatment for a number of diseases, these claims had not been verified by the FDA or in human clinical trials.  For example, according to a *Washington Post* article dated April 1, 2013, entitled, "McDonnell Traded Favors with Dietary Supplements Maker Now Under Investigation" the director of medical and scientific operations at the Alzheimer's Association, Heather M. Snyder, stated that "there really is not data to support [Anatabloc as a potential treatment for Alzheimer's disease] at this time."  In addition, according to a *Richmond Times-Dispatch* article dated July 21, 2013, entitled "Anatomy of Anatabloc," David Schardt, a senior nutritionist for the Center for Science in the Public Interest, a nonprofit health advocacy group, noted that without valid clinical trial results, Anatabloc's "long-term health effects for people we[re] unclear," and that "[i]n this respect, Anatabloc is like a lot of other dietary supplements that make explicit or implicit claims that exceed the scientific evidence."

64.    While the hype Star Scientific had generated from misleading investors into believing that Johns Hopkins was officially involved in Anatabloc had artificially inflated its share price, some investors were still sitting on the sidelines until an elite medical institution offered documented proof of its effectiveness.  As Bradley stated in his August 1, 2012 report: "Most medical/biotech analysts and money managers have little or no interest investing in stocks with futures not yet medically/scientifically documented.  However, interest can spike quickly after documentation."

65.    Accordingly, while Roskamp was also performing testing on Anatabloc, the attention of investors and equity analysts was almost entirely focused on the anticipated results of the Human Study.  If such results were positive, Johns Hopkins' attachment to the study would attract worldwide media publicity and confer instant acceptance by the scientific and medical communities, which would likely generate a significant increase in sales and demand for the stock among institutional investors.  For example, in his August 2, 2013 Gilford report, Bradley repeatedly pointed to the prestige of the Johns Hopkins name in explaining the reasons why the Human Study was so important, stating in part:

(a)    "Flint is not exactly a household name.  Johns Hopkins is recognized worldwide" and power and prestige of the name Johns Hopkins are significant;

(b)    "If the [Johns] Hopkins study results are positive," that could potentially influence doctors worldwide, as "we anticipate a great many doctors will follow the Hopkins-Ladenson lead and recommend their thyroid patients use Anatabloc"; and

(c)    "We estimate [potential] revenue in 2013 of $400 million of revenue and $1.00 per share of earnings [which] is computed solely from that which we believe Star [Scientific] might be able to achieve from the Johns Hopkins impact on U.S. Anatabloc results."

66.     In a January 2, 2013 Gilford report, Bradley added that Johns Hopkins' supposed sponsorship of the Human Study was important, not only because of the prestige of the Johns Hopkins name, but also because it meant it was being performed by an independent institution, which gave it more credibility.   Based on his misunderstanding that Johns Hopkins was conducting the Human Study, he stated that the upcoming release of its results "will be the first completion of tests by a Third Party CRO (Clinical Research Organization) judging Star's technology on human beings," in contrasting this study with the ones being conducted by the interested Roskamp and affiliated Rock Creek.   He further stated that, if the results of the study were successful, Hopkins would expand its research on the compound, stating that "[Johns] Hopkins will continue to test this technology and its efficacy on at least two or three diseases other than Thyroid."

67.     Other investors who published reports about the Company made similar statements about the release of the Human Study's results being a watershed moment for Star Scientific based on Johns Hopkins ostensible involvement in it.   For example, Dr. Faessel stated in his October 9, 2012 report that "a positive report could/would be a defining moment/tipping point" and that "[p]ositive results" will validate the science and garner significant world-wide press."   In an article in his November 17, 2012 investment newsletter *Outside the Box* entitled, "One (Biotech) Ring to Rule Them All," John Mauldin stated: "The Hopkins thyroid study results should be completed in December, but we already know that the human studies are providing statistically significant results.   If they are similar to the animal studies, which provided the first ever improvements in thyroid disease, we will be able to reach extremely important scientifically validated conclusion."

68.     On January 7, 2013, Star Scientific announced preliminary results of the Human Study, which it claimed to show, without providing any supporting data, that Anatabloc lessens inflammation in patients with thyroiditis.  Star Scientific included a quote from Dr. Ladenson in the press release, in which he claimed that the interim results from the study were positive. Nowhere in this press release or any public statement does the Company disclose that it was paying Dr. Ladenson to consult on the study and provide this purportedly independent assessment.  Upon the announcement of the preliminary results, without any supporting data, Star Scientific's stock price jumped 8%.

I.      **U.S. Department of Justice Subpoenas**

69.     In late January and early February 2013, the Company received subpoenas from the U.S. Attorney's Office concerning potential fraud related to the Company's private placement offerings between 2006 and 2013.  The Company waited until March 18, 2013, to reveal, in its 2012 10-K, that the Company and its directors had received subpoenas from the U.S. Attorney's Office concerning an investigation into whether the Company had engaged in potentially illegal transactions involving certain private placements and related party transaction since 2006.

V.      **DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

70.     During the Class Period, defendants made a number of false and misleading statements and omitted material information that, taken together, misled investors into believing that: (i) the Animal Study was officially sponsored and independently conducted by Johns Hopkins without the involvement or financial support of Star Scientific or affiliated parties; and (ii) the Human Study was officially and independently sponsored and conducted by Johns Hopkins as well without the involvement or financial support of Star Scientific or affiliated parties.

- 31 -

71.     On May 10, 2011, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2011, in which it disclosed the material developments of its Anatabloc research and development program, including that it was collaborating with Roskamp on a clinical trial of Anatabloc, stating:

> Currently Rock Creek is working with the Roskamp Institute in connection with a multi-site clinical trial of Rock Creek's RCP-006 nutritional supplement formula to examine the effect of RCP-006 on chronic inflammation in individuals who have elevated blood levels of C-reactive protein ("CRP").

72.     In prior SEC filings, Star Scientific disclosed that it had entered into a collaborative relationship with Roskamp in conducting research on Anatabloc and in this Form 10-Q, it disclosed that it was working with Roskamp on a particular trial.  By undertaking to make these disclosures about its research and development efforts, Star Scientific implied to investors that its only research partner was Roskamp and the only study it was involved in at this time was the above trial.   These statements are therefore misleading in light of the fact that Star Scientific had retained Drs. Ladenson and Caturegli as paid consultants in connection with the development and testing of Anatabloc and was supporting the then-ongoing Animal Study.   It was particularly critical that defendants provide such information because investors had already been misled to believe, based on publicly available information, that Johns Hopkins was officially and independently involved in the clinical testing of Anatabloc, giving the product the aura of independent scientific credibility it would not otherwise have had, and thereby artificially driving up its share price.   Thus, it was important for defendants to correct this widely held misperception by specifically disclosing that the two lead researchers, although employed at Johns Hopkins during this period, were not officially acting on its behalf in conducting the Animal Study, but that they were paid consultants of Star Scientific and also disclosing the financial terms of their consulting agreements.   In contrast to defendants' omissions about its

collaborative arrangement with these researchers, as set forth in ¶71, the Company fully disclosed the nature and extent of its conflicted and interested relationship with Roskamp in connection with its testing of Anatabloc.  Defendants Williams and Dodd each signed internal control certifications attesting that, based on their review of this 10-Q, it contained no false or materially misleading statements or omissions.

73.     On August 9, 2011, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2011, in which it disclosed the material developments of its Anatabloc research and development program, including that it was collaborating with Roskamp on a clinical trial of Anatabloc, stating:

> Currently Rock Creek is working with the Roskamp Institute in connection with a multi-site clinical trial of Rock Creek's RCP-006 nutritional supplement formula to examine the effect of RCP-006 on chronic inflammation in individuals who have elevated blood levels of [CRP].

74.     In prior SEC filings, Star Scientific disclosed that it had entered into a collaborative relationship with Roskamp in conducting research on Anatabloc and in this Form 10-Q, it disclosed that it was working with Roskamp on a particular trial.  By undertaking to make these disclosures about its research and development efforts, Star Scientific implied to investors that its only research partner was Roskamp and the only study it was involved in at this time was the above trial.   These statements are therefore misleading in light of the fact that Star Scientific had retained Drs. Ladenson and Caturegli as paid consultants in connection with the development and testing of Anatabloc and was providing support to the then-ongoing Animal Study.  It was particularly critical that defendants provide such information because investors had already been misled to believe, based on publicly available information, that Johns Hopkins was officially and independently involved in the clinical testing of Anatabloc, giving the product the aura of independent scientific credibility it would not otherwise have had, and thereby

artificially driving up its share price.  Thus, it was important for defendants to correct this widely held misperception by specifically disclosing that the two lead researchers, although employed at Johns Hopkins during this period, were not officially acting on its behalf in conducting the Animal Study, but that they were paid consultants of Star Scientific and also disclosing the financial terms of their consulting agreements.  In contrast to defendants' omissions about its collaborative arrangement with these researchers, as set forth in ¶73, the Company fully disclosed the nature and extent of its conflicted and interested relationship with Roskamp in connection with its testing of Anatabloc.  Defendants Williams and Dodd each signed internal control certifications attesting that, based on their review of this 10-Q, it contained no false or materially misleading statements or omissions.

75.    On October 18, 2011, the Company and Rock Creek issued a press release entitled "Rock Creek Pharmaceuticals Announces Expanded International Shipping Options for Anatabloc<sup>TM</sup>, Physician Conferences on Anatabine Research," in which the Company made the following misleading statements regarding Johns Hopkins' involvement in the Animal Study:

> The company also announced that it is hosting the first of a series of Anatabloc conferences for physicians this evening in Richmond, Virginia. ***Presentations on research using anatabine will be made by ... Paul Ladenson, MD, Director of Endocrinology & Metabolism at the Johns Hopkins School of Medicine; and Patrizio Caturegli, MD, MPH, Associate Professor of Pathology and Endocrinology at the Johns Hopkins School of Medicine***.

76.    Defendants' press release is materially misleading because it touts that Drs. Ladenson and Caturegli led the Animal Study and cites to their positions at Johns Hopkins while, at the same time, failing to disclose that: (i) the lead researchers were acting as paid consultants for Star Scientific in connection with the development and testing of Anatabloc (*see* ¶¶5, 7, 52, 72, 74); and (ii) Star Scientific and its affiliates had provided key support to the Animal Study (*see* ¶¶5, 53-54).  Taken together, these statements and omissions give the materially misleading

impression that the Animal Study was officially and independently sponsored and conducted by Johns Hopkins without the involvement or financial support of Star Scientific or affiliated parties. Notably, as set forth in ¶¶54-58, equity analysts and avid investors who closely followed and analyzed news about the Company uniformly believed that the Animal Study was an independent Johns Hopkins-sponsored study until the truth was revealed in the January 23, 2013 article by The Street, as disclosed below.

77. On October 31, 2011, the Company and Rock Creek issued a press release entitled "Rock Creek Pharmaceuticals Announces Completion of Medical Conferences on Anatabloc™ Research, Comments on Research Presentation at American Thyroid Association Annual Meeting," in which the Company made the following misleading statements regarding Johns Hopkins' involvement in the Animal Study:

> Rock Creek Pharmaceuticals, a wholly owned subsidiary of Star Scientific, Inc. today announced the second presentation of research findings related to its Anatabloc™ dietary supplement. A poster presentation, titled "Anatabine, a Tobacco Alkaloid, Ameliorates Disease in a Mouse Model of Thyroiditis", was made at the 81st annual meeting of the American Thyroid Association in Indian Wells, CA. The four authors, all researchers at the Johns Hopkins University School of Medicine, included Paul W. Ladenson, MD and Patrizio Caturegli, MD. The presentation described the positive effect of anatabine supplementation in decreasing the incidence and severity of thyroiditis in animal models of the human disease. Anatabine is an alkaloid found in plants in the Solinacea family, such as green peppers, green tomatoes and eggplant.

> Rock Creek also commented that research underlying the October 27 presentation has been one of the topics at three recent medical conferences hosted by the company for physicians and allied healthcare practitioners. The first, held on October 18 in Richmond, VA featured presentations by Drs. Ladenson and Caturegli on their experimental research on autoimmune thyroiditis, followed by discussion.

78. Defendants' press release is materially misleading because it touts that Drs. Ladenson and Caturegli led the Animal Study and are researchers at Johns Hopkins, and publicizes their findings while, at the same time, failing to disclose that: (i) the lead researchers were acting as paid consultants for Star Scientific in connection with the development and testing

of Anatabloc (*see* ¶¶5, 7, 52, 72, 74); and (ii) Star Scientific and its affiliates had provided key support to the Animal Study (*see* ¶¶5, 53-54).   Taken together, these statements and omissions give the materially misleading impression that the Animal Study was officially and independently sponsored and conducted by Johns Hopkins without the involvement or financial support of Star Scientific or its affiliates.   Notably, as set forth in ¶¶54-58, equity analysts and avid investors who closely followed and analyzed news about the Company uniformly believed that the Animal Study was an independent Johns Hopkins-sponsored study until the truth was revealed in the January 23, 2013 article by The Street, as disclosed below.

79.     On November 9, 2011, the Company filed with the SEC its Quarterly Report on Form 10-Q for period ended September 30, 2011 in which it disclosed the material developments of its Anatabloc research and development program, including that it was collaborating with Roskamp on a clinical trial of Anatabloc, stating:

> Currently Rock Creek is working with the Roskamp Institute in connection with a multi-site clinical trial of Rock Creek's RCP-006 compound to examine the effect of RCP-006 on chronic inflammation in individuals who have elevated blood levels of [CRP].

80.     In prior SEC filings, Star Scientific disclosed that it had entered into a collaborative relationship with Roskamp in conducting research on Anatabloc and in this Form 10-Q, it disclosed that it was working with Roskamp on a particular trial.   By undertaking to make these disclosures about its research and development efforts, Star Scientific implied to investors that its only research partner was Roskamp and the only study it was involved in at this time was the above trial.   These statements are therefore misleading in light of the fact that Star Scientific had retained Drs. Ladenson and Caturegli as paid consultants in connection with the development and testing of Anatabloc, and had provided key support to the Animal Study.   It was particularly critical that defendants provide such information because investors had already

been misled to believe, based on publicly available information, that Johns Hopkins was officially and independently involved in the clinical testing of Anatabloc, giving the product the aura of independent scientific credibility it would not otherwise have had, and thereby artificially driving up its share price.   Thus, it was important for defendants to correct this widely held misperception by specifically disclosing that the two lead researchers, although employed at Johns Hopkins during this period, were not officially acting on its behalf in conducting the Animal Study, but that they were paid consultants of Star Scientific and also disclosing the financial terms of their consulting agreements.   In contrast to defendants' omissions about its collaborative arrangement with these researchers, as set forth in ¶79, the Company fully disclosed the nature and extent of its conflicted and interested relationship with Roskamp in connection with its testing of Anatabloc.   Defendants Williams and Dodd each signed internal control certifications attesting that, based on their review of this 10-Q, it contained no false or materially misleading statements or omissions.

81.   Also November 9, 2011, the Company issued a press release entitled "Star Scientific Files Third-Quarter Financials, Updates Anatabloc Sales," in which the Company made the following misleading statement about Johns Hopkins' involvement in the Animal Study:

> As the company indicated in a recent press release, research conducted at the Johns Hopkins University School of Medicine, which examined anatabine and thyroiditis in an animal model, was presented on October 27 at the 81st annual meeting of the American Thyroid Association.

82.   Defendants' press release is materially misleading because it references the Animal Study as being conducted "at Johns Hopkins" while, at the same time, failing to disclose that, (as set forth in ¶¶5, 7, 52, 72, 74),  the lead researchers were acting as paid consultants for Star Scientific in connection with the development and testing of Anatabloc.   Taken together,

these statements and omissions give the materially misleading impression that the Animal Study was officially and independently sponsored and conducted by Johns Hopkins without the involvement or financial support of Star Scientific or affiliated parties. Notably, as set forth in ¶¶54-58, equity analysts and avid investors who closely followed and analyzed news about the Company uniformly believed mistakenly that the Animal Study was an independent Johns Hopkins-sponsored study until the truth was revealed in the January 23, 2013 article by *The Street*, as disclosed below.

83.     On March 15, 2012, Star Scientific filed with the SEC its 2011 10-K, in which the Company made the following false and misleading statements, in relevant part, regarding Johns Hopkins' involvement in the Animal Study and Human Study:

> ***In 2011 and 2012 ... researchers at John[s] Hopkins University completed and reported on a number of studies designed to assess the ability of our anatabine citrate compound to lower chronic inflammation in a variety of pre-clinical and clinical settings .... Also, researchers from Johns Hopkins presented a poster at the annual meeting of the American Thyroid Association. The reported research showed the positive effect of anatabine citrate supplementation in decreasing the incidence and severity of thyroiditis in animal models of the human disease.***

84.     Defendants' 2011 10-K is materially misleading because it makes repeated references to testing of Anatabloc performed by "researchers at Johns Hopkins" and publicizes their findings of the Animal Study without disclosing that:(i) the lead researchers were acting as paid consultants for Star Scientific in connection with the development and testing of Anatabloc (*see* ¶¶5, 7, 52, 72, 74); and (ii) Star Scientific and its affiliates had provided key support to the Animal Study (*see* ¶¶5, 53-54). Taken together, these statements and omissions give the materially misleading impression that the Animal Study was officially sponsored and independently conducted by Johns Hopkins without the involvement or financial support of Star Scientific or affiliated parties. Notably, as set forth in ¶¶54-58, equity analysts and avid

investors who closely followed and analyzed news about the Company uniformly believed that the Animal Study was an independent Johns Hopkins-sponsored study until the truth was revealed in the January 23, 2013 article by The Street, as disclosed below.  Defendants Williams and Dodd each signed internal control certifications attesting that, based on their review of this 10-K, it contained no false or materially misleading statements or omissions.

85.     On June 27, 2012, the Company issued a press release entitled "Star Scientific Announces Noteworthy Anatabloc® Scientific Presentation at ENDO 2012," in which it made a number of false and misleading statements about Johns Hopkins' involvement in both the Human Study and Animal Study:

> *The independently funded research team at Johns Hopkins conducted and completed a study of anatabine nutritional supplementation in a mouse model of autoimmune thyroiditis, entitled "Anatabine, a Tobacco Alkaloid, Reduces Disease Incidence and Severity in a Mouse Model of Autoimmune Thyroiditis."*
>
> Studies performed in the immunopathology laboratory of Dr. Patrizio Caturegli utilized female mice, placing half of them on dietary supplementation (drinking water) with anatabine, and the other half on plain water. All mice were injected with mouse thyroglobulin in Freund's adjuvant, a procedure that reliably induces autoimmune thyroiditis with histopathological features and thyroid gland dysfunction similar to Hashimoto's thyroiditis in humans.
>
> * * *
>
> *The results of the full study, which was preliminarily reported in a poster presentation last fall at the Annual Meeting of the American Thyroid Association, led Dr. Paul W. Ladenson, Director of Endocrinology and Metabolism at Johns Hopkins, to comment, "Our finding that anatabine reduces the incidence and severity of autoimmune thyroiditis in this mouse model justifies human studies of whether this nutritional supplement may be effective in preserving thyroid health in people with Hashimoto's thyroiditis.* Consequently, a human trial to test this hypothesis (the ASAP Thyroid Study) was designed and is now being carried out."
>
> Dr. Curtis Wright, Senior Vice President and Medical/Clinical Director of Star Scientific's wholly owned subsidiary Rock Creek Pharmaceuticals Inc., stated, "We started our research with the simple goal of developing a useful nutritional supplement. The possibility, now supported by external research findings that one of our products could help maintain thyroid health, is very exciting to us, and is

- 39 -

ample reward for the efforts of Rock Creek's research team in designing and conducting the ASAP Thyroid Study with the oversight assistance of an independent scientific committee. ***The current impressive results achieved by the Johns Hopkins team strongly support the first look at the thyroid data in man, which we anticipate will be available in the third quarter."***

86.    With respect to the Animal Study, defendants' press release is false and materially misleading because it touts the Animal Study as being "independently funded," being performed by "Johns Hopkins" and includes a quote from Dr. Ladenson touting his positive findings on the study without disclosing that (i) lead researchers Drs. Ladenson and Caturegli were, in fact, acting as paid consultants for Star Scientific in connection with the development and testing of Anatabloc; and (ii) Star Scientific and its affiliates had provided key support to the study.

87.    Taken together, these statements and omissions give the materially misleading impression that both the Animal Study was officially and independently sponsored and conducted by Johns Hopkins without the involvement or financial support of Star Scientific or affiliated parties.  With respect to the Human Study, defendants' press release is also false and materially misleading because it includes quotes from Dr. Ladenson and defendant Wright linking the two studies together and implying the Human Study was a follow-on extension of the Animal Study that was conducted by same research team at Johns Hopkins.  Taken the statements as a whole, they give the materially misleading impression that Dr. Ladenson and his team conducted the Human Study on behalf of Johns Hopkins, when, in fact, as set forth in ¶¶62-67, Johns Hopkins was not involved in the Human Study at all.  Notably, as set forth in ¶¶54-58, equity analysts and avid investors who closely followed and analyzed news about the Company uniformly believed mistakenly that the Animal Study and Human Study were independent Johns Hopkins-sponsored studies until the truth was revealed in the January 23, 2013 article by *The Street*, as disclosed below.

88.     On November 9, 2012, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2012, in which it disclosed the terms of its collaborative arrangement with Roskamp, stating in part:

> Research and Development expenses: We expended approximately $2.2 million in connection with the refinement of our product formulation for CigRx®, Anatabloc™ product development, ongoing research directed to the effects of our RCP-006 compound on chronic inflammation in individuals who have elevated blood levels of CRP and for other uses of RCP-006. During the nine months ended September 30, 2010, Rock Creek incurred approximately $2.4 million primarily in connection with the initial product development and premarket testing of the dietary ingredients in CigRx®. Given our working capital constraints, our ability to continue the research efforts of Star Scientific and to advance the research and development activities of Rock Creek will depend on our ability to obtain funding for these initiatives through improved revenues from our smokeless tobacco sales and sales of our dietary supplements or from other funding sources.

89.     Here and in prior SEC filings, defendants disclosed the terms of Star Scientific's collaborative agreement with Roskamp and the amount they had paid under this agreement.  By undertaking to make these disclosures about its partnership with Roskamp, Star Scientific implied to investors that its only research partner was Roskamp when, in fact, Star Scientific had also engaged Drs. Ladenson and Caturegli as paid consultants in connection with its development and testing of Anatabloc.  Given that defendants had misled investors into believing that Johns Hopkins was officially and independently involved in the clinical testing of Anatabloc based on their misleading statements about the nature of Drs. Ladenson's and Caturegli's research efforts, it was particularly important for defendants to correct this misperception by disclosing: (i) that these lead researchers, although employed at Johns Hopkins during this period, were not acting on its behalf in conducting in the study; (ii) that, in fact, they were working as paid consultants of Star Scientific; and (iii) the financial terms of their consulting agreements.  In contrast to defendants' omissions about its collaborative arrangement with these researchers, as

set forth in ¶88, the Company fully disclosed the nature and terms of its conflicted and interested relationship with Roskamp in connection with its testing of Anatabloc.

90.     On January 7, 2013, the Company issued a press release entitled "Star Scientific/Rock Creek Pharmaceuticals Report Positive Initial Results of ASAP Human Thyroid Health Study Showing Benefits in Immune System Support," in which the Company made the following misleading statement further suggesting Johns Hopkins' official involvement in the Human Study:

> GLEN ALLEN, Va., Jan. 7, 2013 /PRNewswire/ -- Star Scientific, Inc. (NASDAQ: STSI) announced today the preliminary results of the Company's ASAP (Anatabloc Supplementation Autoimmune Prevention) Human Thyroid Study that analyzes the impact of anatabine dietary supplementation on thyroid health.
>
> * * *
>
> Dr. Paul Ladenson, senior endocrinological consultant for the study, stated, "Data from this rigorously conducted, placebo-controlled, double blind trial show that anatabine-treated subjects had progressive decreases in circulating thyroglobulin antibody levels, which became significant by the end of the trial.   Current treatment for autoimmune thyroiditis is limited to end-stage disease when irreversible gland damage necessitates lifelong thyroid hormone replacement. The prospect of a novel nutritional or pharmaceutical intervention that could preserve thyroid health represents an encouraging advance.   Further clinical studies are now warranted."

91.     In light of defendants' repeated prior statements touting Dr. Ladenson's affiliation with Johns Hopkins and his work on testing of Anatabloc, defendants' press release, in which they tout Dr. Ladenson's involvement in the Human Study and his assessment of the findings of the study without disclosing that he was, in fact, acting as paid consultant for Star Scientific in connection with its research efforts, including this study, is materially misleading.  In particular, defendants' inclusion of a quote from Dr. Ladenson—in which he gave a rosy assessment of the interim results—without disclosing that he was working as a paid consultant for Star Scientific on the Human Study, is materially misleading because it gives the misleading impression that he

was giving an independent assessment as an academic researcher, rather than as a paid consultant, and that, together with the above false and misleading statements, continued to give the misleading impression that he was working on this study on Johns Hopkins' behalf rather than as a paid consultant.

92.     Equity analysts and dedicated Star Scientific investors uniformly believed mistakenly that both the Animal Study and Human Study had been independently sponsored and conducted by Johns Hopkins.  Based on their reports, no one understood that Drs. Ladenson and Caturegli were moonlighting as paid consultants for Star Scientific in connection with the clinical development and testing of Anatabloc, without any official involvement of Johns Hopkins.  For example, Gilford analyst Bradley wrote a series of reports in 2012 and early 2013 in which he consistently referred to the Human Study as the Hopkins Study or something to that effect.  In his report dated August 1, 2012, in discussing the anticipated results of the Human Study, he referred to it as the "Hopkins results," "Hopkins study," and "Hopkins tests."  In addition, he wrote seven more reports between September 18, 2012 and January 10, 2013, in which he repeatedly referred to this study as the "Johns Hopkins study" or "the thyroid research ... done by Johns Hopkins University School of Medicine."

93.     Similarly, Dr. Faessel, who is a longtime investor in Star Scientific and publishes reports about Star Scientific, clearly believed that both studies were performed by Johns Hopkins, as reflected by his unambiguous reports on the matter in 2011 and 2012.  After listening to talks from defendant Williams and Drs. Ladenson and Caturegli at the June 1, 2011 conference at Roskamp Institute, Dr. Faessel published reports dated June 2, 7, and 29, 2011, in which he referred to the Animal Study as the "studies at ... Johns Hopkins" and "breakthrough research that is underway at … Johns Hopkins University" and "research at ... Johns Hopkins."

- 43 -

In another article dated July 13, 2011, Dr. Faessel stated that it was a "fact" that "Star is working with Johns Hopkins University," in attempting to give scientific credibility to the results of the Animal Study.  In an April 16, 2012 study, he similarly cited to Johns Hopkins' official involvement in the Human Study stating, "Lets also remember that Johns Hopkins is the major player here.  Can you imagine Johns Hopkins spending all this time, energy and money not to mention jeopardizing their pristine reputation chasing some sham?"  In an October 9, 2012 report, he refers to the Human Study as the "Johns Hopkins research" and states that "Johns Hopkins [was] about to release their nine city study on the effects of Anatabine/Anatabloc on thyroid disease." In addition, in a November 12, 2012 report, Dr. Faessel refers to the Human Study as the "the Johns Hopkins thyroid study" in informing investors that the results "are due in December" and later references a Star Scientific press release about the "Johns Hopkins thyroid study in humans."  Finally, in a November 17, 2012 investment newsletter published by renowned financial expert John Mauldin, he refers to the Human study as "the Hopkins thyroid study."

## VI.     THE TRUTH IS REVEALED

94.     On January 23, 2013, *The Street* published an article entitled Star Scientific's Made-Up, Misleading Relationship With Johns Hopkins," which disclosed that Star Scientific had misled its investors concerning Johns Hopkins' involvement in the clinical testing of Star Scientific's nutritional supplement anatabine.  More specifically, the article revealed that Johns Hopkins had not sponsored or been officially involved with either the Animal Study or Human Study and disclosed for the first time that Drs. Caturegli and Ladenson were acting as paid consultants for Star Scientific in connection with the clinical development and testing of Anatabloc.  The article stated in part:

Manti Te'o isn't alone in concocting imaginary relationships.  So, too, is Star Scientific, which has misled investors about the involvement of Johns Hopkins University in the clinical testing of the company's retail nutritional supplement anatabine.

Star Scientific and its Internet stock promoters want investors to believe that Johns Hopkins has been actively involved with, and even supportive of anatabine's clinical development.  The benefit to Star Scientific is obvious: Johns Hopkins is well-known and respected, so the school's academic imprimatur lends scientific credibility to anatabine.

Except Johns Hopkins has no official involvement with Star Scientific or anatabine.   That includes Star's subsidiary Rock Creek Pharmaceuticals, according to a Johns Hopkins School of Medicine spokesperson.

"The Anatabloc Supplementation Autoimmune Prevention [ASAP] clinical study was not conducted at or approved by Johns Hopkins," Johns Hopkins' Stephanie Desmon said via email.

Star reported initial interim results from the ASAP study of anatabine as a potential treatment for thyroid disease on Jan. 7.  The company claims the study succeeded but failed to disclose any real data.  Star's press release included a promotional quote about anatabine from Dr. Paul Ladenson, described as a "senior endocrinological consultant" for the study.

Ladeneson's[sic] real job is director of the Division of Endocrinology and Metabolism at Johns Hopkins School of Medicine.  He's a thyroid disease expert.  Why did Star Scientific omit Ladenson's academic affiliation from its Jan. 7 press release? Likely because as Desmon made clear, Ladenson's role in Star Scientific's anatabine thyroid disease study had nothing to do with Johns Hopkins.

Star Scientific paid Ladenson for his consulting work, which apparently includes offering this assessment of the anatabine thyroid study:

> Data from this rigorously conducted, placebo-controlled, double blind trial show that anatabine-treated subjects had progressive decreases in circulating thyroglobulin antibody levels, which became significant by the end of the trial.  Current treatment for autoimmune thyroiditis is limited to end-stage disease when irreversible gland damage necessitates lifelong thyroid hormone replacement.   The prospect of a novel nutritional or pharmaceutical intervention that could preserve thyroid health represents an encouraging advance.  Further clinical studies are now warranted.

Asked to comment on whether Johns Hopkins, as Ladenson's employer, approved his anatabine statement, Desmon responded:

"We do have guidelines about such things and he [Ladenson] is in violation here." Johns Hopkins has started an inquiry into the matter, Desmon added.

Johns Hopkins would not make Ladenson available to comment.  Star Scientific did not respond to an email requesting comment.

Dr. Patrizio Caturegli, also a professor at Johns Hopkins Medical School and a paid consultant to Star Scientific, co-authored a paper last year with Ladenson in which mice were treated with anatabine.  Star Scientific publicizes the findings of Caturegli's paper without disclosing the company's financial relationship with the authors.

As it stands, there is no science backing Star's claims that anatabine reduces inflammation, relieves pain or treats Alzheimer's, thyroid disease, multiple sclerosis, traumatic brain injury or other auto-immune diseases [These are all medical claims Star makes or insinuates with its constant anatabine promotions.]

Anatabine is not FDA approved for anything, but thanks to lax rules and generous loopholes, Star is able to sell the nutritional supplement over the Internet and at GNC retail outlets.  What Star hasn't been able to do is convince people to buy anatabine.   Sales are minimal, totaling just $1.7 million in the last reported quarter.

Which is where the Johns Hopkins connection comes into play.  Star wants investors and the general public to believe anatabine is a drug capable of curing all sorts of diseases.  The marketing message is simple: If Johns Hopkins believes in anatabine, you should too.

Internet stock promoter Dr. John Faessel (he's a dentist) embraces Star's misleading marketing message and runs with it.  In two columns posted recently on Seeking Alpha - both bullish on Star Scientific - Faessel refers repeatedly to the "successful Rock Creek/Johns Hopkins human trials of anatabine."

Wrong.  Johns Hopkins had no involvement in the anatabine trial.

Gilford Securities analyst Otis Bradley also plays along with the deception.  In a recent research note, Bradley writes, "The [anatabine] thyroid research has been done by the Johns Hopkins University School of Medicine, certainly one of the most preeminent medical institutions in the world, under the lead of Paul Ladenson, chief endocrinologist and one of the preeminent leaders in the world in his profession."

Wrong again.  Star Scientific is solely in charge of the anatabine thyroid study, which recruited patients from nine private U.S. clinics, none with academic credentials.  Ladenson may be an expert on thyroid disease but he's being paid by Star Scientific.

Star Scientific also pays golfer Fred Couples to endorse anatabine.  At this point, there's very little to distinguish Couple's advertising pitch and Ladenson's consulting work.

95.     As a result of this news, Star Scientific's stock dropped $0.31 per share, to close a $2.33 per share—a one-day decline of nearly 12% on volume of six million shares.

96.     On January 28, 2013, Star Scientific issued a press release in which it attempted to refute *The Street* article, but did not effectively rebut any of the facts disclosed in it.  In fact, in its press release, Star Scientific confirmed that the Human Study "was conducted by Rock Creek ... [and] was not sponsored by the Johns Hopkins School of Medicine" and did not even address *The Street's* disclosure that Drs. Ladenson and Caturegli were acting as paid consultants for Star Scientific in connection with the clinical development and testing of Star Scientific.  As for *The Street's* allegation that Johns Hopkins had no official involvement with Anatabloc or Star Scientific whatsoever, Star Scientific vaguely responded only that the Animal Study was conducted "from Johns Hopkins" without disclosing any details as to what it supposed involvement in this study entailed.  In the press release, defendants do not claim that Johns Hopkins officially sponsored the Animal Study or that it even approved or provided any financial or material support to it.  The failure to include such details further demonstrates that Johns Hopkins was not officially involved in this study either.  Based on the fact that Star Scientific's share price slightly dropped following the publication of the press release, investors also apparently felt that it confirmed the truth of the damaging facts revealed in *The Street's* article.

97.     As a result of defendants' false statements, Star Scientific stock traded at artificially inflated levels during the Class Period.  In fact, despite the Company's horrendous financial performance, its share price regularly traded above $3 per share during the Class Period, reaching a high of $5.21 per share on May 31, 2011.  Industry observers and equity analysts noted that the Company's stock price was completely out of line with its actual financial

performance and that the sustainability of this high trading level depended entirely on the inflated prospects for Anatabloc.  In other words, Star Scientific's pumped up share price was the product of the investors' view that Anatabloc's sales were about to take off, which was driven by their belief that, through the clinical trials Johns Hopkins was supposedly conducting, it would provide the scientific validation the Company so desperately needed.

98.    Indeed, on or around June 30, 2011, the Company had a $600 million market value reflecting an astounding 720x prior year's sales multiple based on the Company's then-trading price.  Gilford analyst, Bradley, specifically linked Johns Hopkins' apparent involvement in testing Anatabloc to the Company's ability to maintain such a significant "market capitalization" despite a repeated "lack of sales and serious losses."  Bradley's August 1, 2012 report repeatedly references the studies allegedly being conducted by Johns Hopkins and notes that the Company's trading price is heavily dependent on the release of the results from those studies, stating that "[t]he failure of the Johns Hopkins study … could cause *material weakness in the [Company's] stock*."

## VII.    LOSS CAUSATION

99.    As detailed above, the defendants made false and materially misleading statements and engaged in a scheme to deceive the market during the Class Period.  Specifically, defendants knowingly and fraudulently caused the price of Star Scientific securities to be inflated by making false and misleading statements regarding Johns Hopkins' involvement in the clinical testing of Anatabloc and failing to disclose that Drs. Ladenson and Caturegli were paid consultants for Star Scientific and that Star Scientific had provided advice, guidance, and financial support for the Animal Study.

100.    These false and material misstatements had the cause and effect of creating an unrealistically optimistic sentiment in the market concerning the future prospects of Anatabloc

- 48 -

and, in turn, the Company's operations and future growth as a whole.  As a result, Star Scientific securities were being overvalued by investors and analysts alike and the trading price of the Company's stock was artificially inflated throughout the entirety of the Class Period.  The members of the Proposed Class were, therefore, harmed in that they ultimately acquired the Company's securities at exaggerated prices.

101.    Once it was made public that Johns Hopkins has not been officially involved in the clinical testing of Anatabloc and that Drs. Ladenson and Caturegli were acting as paid consultants for Star Scientific, and not on behalf of Johns Hopkins, in connection with clinical testing of Anatabloc, the price of the Star Scientific securities fell precipitously.  Accordingly, the members of the Proposed Class suffered economic losses (i.e., damages) as a direct result of defendants' Exchange Act violations for which they are entitled to recovery.

102.    The following graph demonstrates the changes in the trading price of the Company's stock during the Class Period.  The dotted line reflects the date on which defendants' false and misleading statements were corrected in the market and demonstrates the extent to which those statements artificially pumped up the trading price of Star Scientific's common stock.



103.   The trading price variance reflected in the above chart as a result of the identified corrective disclosures being made public is significantly higher than the change seen in the NASDAQ and, more importantly, among Star Scientific's peer group, on those same dates.  This fact negates any inference that the losses suffered by the Proposed Class members as a result of the drop in price of Star Scientific securities were caused by general market or industry specific conditions/changes rather than defendants' Exchange Act violations.  The chart below illustrates the percentage change in Star Scientific's stock price on the relevant dates during the Class Period as compared to the changes in the NASDAQ and key competitors of the Company on that same date:

| Disclosure Date | STSI % Change | S&P 500 Index % Change | Russell 3000 Food, Beverage, and Tobacco Subsector Index % Change |
|---|---|---|---|
| 1/23/2013 | -11.7% | 0.2% | -0.4% |

104.   Even with an aggressive calculation of the price change resulting from general market and industry developments on the relevant dates during the Class Period, it is still clear that the truth behind defendants' false and materially misleading statements being revealed directly resulted in the trading price of the Company's stock to immediately fall by over 11%. The resulting millions of dollars in losses suffered by the Proposed Class members are recoverable under the Exchange Act as they are a direct consequence of defendants' misconduct.

## VIII.   DEFENDANTS ACTED WITH SCIENTER

105.   Defendants substantially participated in, and/or acquiesced to, the aforementioned violations of the federal securities laws.  Indeed, defendants acted with scienter in that they knew or recklessly disregarded the fact that: (i) certain of the statements made by them in the name of the Company were false and/or materially misleading; and (ii) such statements would be disseminated to, and relied upon by, the investing public in deciding whether to purchase Star Scientific securities.

106.   As officers and/or directors of the Company, defendants controlled the content of Star Scientific's press releases, and SEC filings.  Accordingly, they had the opportunity to (and did) knowingly falsify and/or limit the information that reached the public concerning Star Scientific and its prospects.  Additionally, defendants closely monitored the media, analyst reports, and other information made public by third parties concerning the Company and knew precisely how the information they were distributing during the Class Period was being interpreted by the market.  Indeed, defendants understood or should have understood that there was a widespread perception by investors that Johns Hopkins had officially and independently sponsored and conducted the Animal Study and Human Study given that, as detailed in ¶¶5, 7, 52-54, 62-67, 72, 74, analysts and investors who published reports about the Company uniformly and clearly reported this as fact to the investing public.

107.    As a result, defendants were able to strategically mislead investors as to the development, testing, and prospects of the Company's only real product, Anatabloc, by intentionally making false and materially misleading statements to the investing public concerning Johns Hopkins' involvement in the clinical testing of the nutraceutical, as discussed *infra* Section V.  By creating the misleading impression that Johns Hopkins was independently and officially conducting studies of defendant Williams' latest unproven offering Anatabloc, defendants were able to convince private placement investors to ignore the Company's worsening financial condition and continue to buy stock in the Company based solely on the hype of Johns Hopkins' supposed association and endorsement of the product.   Given the Company's extreme liquidity concerns, it was crucial that defendants maintained this sole source of funding to keep the Company afloat until they could cash on their significant equity holdings in the Company, a portion of which included stock options, warrants, and other incentive-based payments that had yet to vest and become exercisable.  During the Class Period, defendants were aware that once the final results of the supposed Johns Hopkins-sponsored Human Study were released (which was expected this year), the Company's share price would spike up even further, at which time they could reap tens of millions of dollars from divesting their holdings, as defendant Williams had done in his prior businesses.

**A.      Defendant Williams Knew, or Recklessly Disregarded the Fact that Defendants' Public Statements About Johns Hopkins' Involvement in the Animal Study and Human Study Were False, Incomplete, and/or Materially Misleading**

108.    Defendant Williams knew or recklessly disregarded that each of the above statements was false, and or misleading, as demonstrated by the fact that the fraudulent conduct alleged herein is consistent with his prior fraudulent, illegal, and unsavory business practices.  As set forth in ¶¶27-34, over the course of his nearly thirty year career, defendant Williams has

started-up and run a number of business ventures that sold a touted medical breakthrough product or service, ranging from cutting edge lasers for eye surgery to safe cigarettes to a cure for wrinkles, in which he artificially inflated the stock price by: (i) making exaggerated, often fraudulent, claims about the product and its prospects; and (ii) relying on, and often exploiting, ties to respected academic institutions (primarily Johns Hopkins) to promote and confer the imprimatur of independent scientific and/or medical acceptance on an unproven product.

109.    In particular, as set forth in ¶IV.A, defendant Williams has a longtime association with certain individuals at Johns Hopkins, having partnered up with Johns Hopkins graduates and/or professors on nearly every business venture, and primarily relied on the Johns Hopkins credentials of his partners and used their contacts to promote each of the businesses to investors, often exploiting the relationship with Johns Hopkins in the process.   Accordingly, defendant Williams understood well the powerful association the Johns Hopkins name carries within the scientific and medical community and the need for the official and independent evaluation of such an elite academic institution to give an unproven product scientific credibility among investors, doctors, and consumers.  In addition, it can be inferred that defendants were aware that Johns Hopkins was not officially involved in either of the Studies based on the fact that one of the Board members of the Company, Richard L. Sharp is a member of the Johns Hopkins Medicine Board of Advisors, and in this capacity, would have been intimately familiar with the Company's relationship to Johns Hopkins and would have consulted defendants, who are also Board members and/or members of management, on it.  Taken all of these facts together, along with defendant Williams' history of engaging in fraudulent and unethical business practices in promoting prior businesses, it can be strongly inferred that defendants were aware or recklessly

disregarded that each of his statements referencing or implying Johns Hopkins' official involvement in the clinical testing of Anatabloc was false and/or misleading.

> **B.** **Defendants' Fraudulent Conduct Was Motivated by the Desperate Need to Obtain Additional Funding and Maintain the Company's Ongoing Operations**

110.     Defendants were motivated to mislead investors into believing that Johns Hopkins was officially and independently involved in the clinical development and testing of Anatabloc in order to secure much needed financing and ensure the Company would have the resources necessary to continue the development and marketing of Anatabloc and its other pipeline products.

### 1.     The Company's Need for Significant Financing

111.     Entering the Class Period, there was no question that Star Scientific was in poor financial condition.   As set forth in ¶43, the Company posted operating losses every year between 2003 and 2010 and would go on to suffer greater operating losses in 2011 and 2012 and be forced to drastically reduce its work force.   As a result of its growing financial woes, its stock price slid under $1 per share in 2009 and 2010, resulting in the NASDAQ nearly delisting its stock from the exchange.   Gilford analyst Bradley went so far as to describe the Company's financials as "terrible" and criticizing top management for both paying themselves "large salaries despite these losses" and allowing certain insiders to buy Star Scientific shares at a discount.

112.     As detailed above, Star Scientific's inability to generate a profit stemmed entirely from its lack of success in creating a product that could generate a consistent revenue stream. Since its inception the Company has sold failed product after failed product, from so-called "safer" cigarettes to a smoking substitute product.   After being launched in August 2011, Anatabloc appeared to be Star Scientific's last chance to turn a profit, immediately becoming its best seller, albeit by default.   Still, despite the Company's aggressive marketing efforts, its sales

numbers were minimal.  In 2011, Star Scientific generated just $1.2 million in revenue.  While Star Scientific did increase its sales of Anatabloc in 2012, its first full year of selling the product, the revenue was still negligible in comparison to the substantial operating expenses, resulting in operating losses of $24.6 million for the year.

113.    Accordingly, Anatabloc's sales figures were nowhere near the level necessary to bring the Company out of the red.  To make matters worse, the nearly two decades of losses resulting from the failed products produced by Star Scientific and its subsidiaries left the Company with a severe lack of liquidity in the period leading up to the Class Period.  This liquidity concern was only made worse because of the significant legal fees and expenses being incurred by the Company in connection with the filing and protecting of its extensive patent and trademark portfolio during the relevant period.[1]  Collectively, this lack of available funding put the Company at severe risk of going under in less than a year.

114.    Specifically, the 2010 10-K discusses the Company's liquidity concerns and states that Star Scientific had just $13.19 million in cash and equivalents available to fund its ongoing operations entering the 2011 fiscal year.  A section in the 2010 10-K addresses the Company's dire need for financing, stating that it did not have sufficient capital available to fund operations for more than a year:

> ***The recurring losses generated by our operations continue to impose significant demands on our liquidity.*** Over the last several years our liquidity demands have been met principally by private placements of our common stock and from the exercise of related warrants and stock options …. Absent the exercise of outstanding warrants and options for cash or a substantial improvement in revenues and/or royalties, ***the Company believes that it has sufficient funding to support its operations into the first quarter of 2012***, but that it will be necessary ***to pursue additional sources of funds during the first quarter 2012.***

---

[1]  According to the 2012 10-K, the Company had sixteen different patents and twenty-two registered trademarks.

> *However, our business and operations may consume resources faster than we anticipate, and depending upon market conditions and the price of our common stock, we may decide to seek additional funds before that time.* Additional financing may not be available on favorable terms, if at all. *If adequate funds are not available on acceptable terms, we may be unable to fund the expansion of our sales and marketing and research and development efforts or take advantage of other opportunities, which could seriously harm our business and operating results.* If we issue additional equity securities, existing stockholders will experience dilution.

115. Similar sentiments were expressed in the various Quarterly and Annual Reports filed by the Company with the SEC throughout the Class Period and demonstrated the increasingly worse cash position of the Company. For example, as expressed in the 2011 10-K, the Company's cash holdings had fallen to just $10.2 million by the end of fiscal year 2011, reflecting a 22% decrease over the prior year and leaving Star Scientific with sufficient capital to "support [its] operations through the first quarter of 2013." Given the Company's average monthly burn rate of $1.46 million dollars, however, it was more reasonable at this time to expect Star Scientific's to run out of money by the end of July 2012 without any additional funding.

### 2. The Defendants Mislead Investors and the Market in Order to Secure the Funding Necessary to Continue the Company's Operations

116. With insufficient capital to cover the Company's product development and operational expenses for even six months, defendants commenced an aggressive effort to secure financing during the Class Period. However, in light of its repeated operational losses, the Company's access to the debt markets was extremely limited and defendants were forced to rely entirely on equity financing if they wished to remain in business. This required defendants to pay particular attention to the trading price of Star Scientific securities because, as noted in the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2011, their ability to

raise acceptable equity financing depends "on a number of factors, including the ***performance of our stock price***."

117.    The 2012 10-K demonstrates Defendants' keen awareness that the Company's continued existence depended on the market's perception of Star Scientific's future prospects, and more particularly the potential of Anatabloc®, as its specifically states that Star Scientific's future prospects are "dependent on the expanded distribution and consumer acceptance of [its] dietary supplement products."  Without FDA approval or clinical data showing the product was effective and with sales numbers still at low levels, defendants needed positive results from a study by an elite medical institution (like Johns Hopkins) to give credibility to its claims that the nutraceutical was an effective treatment for Alzheimer's disease, traumatic brain injury, and multiple sclerosis and convince consumers, doctors, and investors to buy into the hype.  As set forth in ¶62-67, equity analysts and dedicated investors alike uniformly saw Johns Hopkins' supposed association with Anatabloc as the key value driver for the Company.

118.    Accordingly, defendants were motivated to mislead investors and consumers into believing that Johns Hopkins was officially and independently involved in the development and clinical testing of Anatabloc in order to give it the scientific validation it needed to be accepted by the market, thereby increasing both revenues and the trading price of the Company's stock and, consequently, making it easier to obtain equity financing.  Throughout the Class Period, defendants intentionally failed to disclose that lead researchers Drs. Caturegli and Ladenson were paid consultants of Star Scientific and that they had provided key guidance and advice and financial support to the Animal Study.  Instead they issued a series of false and misleading statements regarding Johns Hopkins' involvement in the Animal Study and Human Study to ensure the market continued to believe that "the power and prestige of ... Johns Hopkins – and

Dr. Ladenson" had independently validated the scientific validity of Anatabloc and was advocating its use.   As a result of this market deception, defendants were able to convince unwary investors to enter into a number of financing transactions during the Class Period, to build up its depleted cash reserves by nearly $13 million (or 55.6%) in just one year, and allowed it to continue its ongoing operations.

119.   Specifically, as noted in the 2012 10-K, the Company's "liquidity demands have been met principally by private placements of [its] common stock and from the exercise of related warrants and stock options."   Indeed, the Company "received proceeds of approximately $33.9 million through private placements and stock option and warrant exercises" in 2012 alone—an increase of approximately 42% and 22% over the equity financing obtained during the entirety of the two prior fiscal years, respectively.

120.   Even the terms of these Class Period equity financing transactions show just how desperate the Company was for financing.   Indeed, defendants continuously offered discounted shares and other incentives, including reduced exercise prices on already owned warrants or, in many instances, entirely free warrants, to investors who agreed to exercise previously issued warrants or otherwise acquire Company shares on an immediate basis.   Specifically, the Class Period equity financing transactions entered into by defendants on behalf of the Company include:

(a)   a December 22, 2011 private placement, pursuant to which an investor agreed to exercise 4.2 million previously issued warrants at a price of $1.50 per share (resulting in $6.3 million of net proceeds to the Company) in exchange for Star Scientific granting the investor 4.2 million new warrants with a $2.32 per share exercise price;

(b)      a February 28, 2012 agreement, pursuant to which another investor was induced into exercising 5,815,254 previously issued warrants at a weighted average price of approximately $1.78 per share (resulting in net proceeds to the Company of $10.4 million) in exchange for an equal number of new warrants with a $4.03 exercise price;

(c)      a second February 28, 2012 securities purchase agreement, pursuant to which the Company agreed to sell 410,000 Star Scientific shares *and* warrants to purchase an additional 410,000 shares at an exercise price of $4.05 to an investor for $1,660,500; and

(d)      a November 2012 warrant reset agreement, pursuant to which 19.5 million warrants to acquire Company stock were exercised in exchange for payments to the Company of $20 million.   18.5 million of the warrants originally had weighted average exercise prices of $2.71 per share which the Company agreed to reduce to $1.00 per share (a 63% discount) due to their immediate need for cash.   The other 1.5 million warrants were owned by defendant Williams and had an exercise price of $1.50 per share.

121.   Had defendants not made the false and materially misleading statements identified *supra* Section V, they would have been unable to secure this desperately needed capital and the Company's operations would have been forced to a halt.   Indeed, the Company's funding activities took a substantial hit when the truth concerning Johns Hopkins' lack of involvement in the clinical testing of Anatabloc was revealed to the market in January of 2013, as they have yet to secure any significant equity financing in the current fiscal year.   Indeed, the sole funding proceeds received by the Company since the truth emerged about Johns Hopkins' lack of involvement in the clinical testing of Anatabloc came during the Class Period when 16,666 previously issued warrants were exercised for proceeds to the Company of just $30,000.   This is

a sharp decline over the $11.6 million in financing the Company secured during the first six months of 2012.

122.   Not surprisingly, by the close of the first quarter of 2013 (just after the Class Period ended) the Company reported cash and equivalent holdings of just over $16 million and they were burning through approximately $2.2 million per month.  In other words, Star Scientific had only enough cash on hand to fund its operations through early November 2013. Even based on the Company's overly optimistic assessment, stating in its August 9, 2013 Quarterly Report on Form 10-Q for the period ended June 30, 2013, that its $11.2 million in operating capital is sufficient "to support operations through the second quarter 2014," the Company will run out of money within the year.

> C.   **Defendants Were Financially Motivated to Maximize the Trading Price of Star Scientific Securities Given Their Stock, Option, and Warrant Holdings**

123.   Defendants were further motivated to artificially inflate the share price of Star Scientific to ensure the vesting of performance based stock options worth millions of dollars.  By way of background, according to the Company's 2011 10-K, on March 14, 2011, defendants Williams, Perito, and Wright were awarded 4.5 million, 4 million, and 300,000 stock options, respectively, with a strike price of $2.95 per share, which reflected a grant day value of over $22.3 million.   The options granted to defendants Williams and Perito were subject to a performance based vesting schedule, according to which 50% of the stock options awarded would vest if the Company's stock traded at above $5 "on any one trading day."   Not coincidentally, upon the news of Johns Hopkins' supposed official involvement in the clinical testing of Anatabloc entering the market, Star Scientific's stock price rose to close above $5 on a single day (May 31, 2011) during the Class Period.[2]  As a result of meeting this objective, 50%

---

[2] Notably, Star Scientific's share price has not closed above $5 since this date.

of the stock options granted to defendants Williams and Perito earlier in the year vested at the end of 2011—which constituted an immediate paper profit to defendants Williams and Perito of over $10 million.

124.    In addition, defendants were also personally motivated to artificially inflate the trading price of the Company's securities through issuance of the false and materially misleading statements and omissions in order to keep their lucrative jobs and ensure they have the opportunity to cash out their substantial stock options and warrants holdings.   After all, if the Company had not been able to secure enough financing to keep it in business, defendants would have lost their lucrative positions as officers and/or directors of the Company along with tens of millions of stock options and warrants that had been awarded to them.

125.    During the Class Period, defendants were paid large salaries and provided with lucrative benefit packages for their role in overseeing a Company that was reporting ever increasing annual losses that cumulatively exceed $231.5 million.   Defendant Williams alone has received a $1 million annual salary since at least 2003 with a total compensation package exceeding $25 million during that same ten-year period.   Shockingly, in 2011—a year in which the Company reported its largest net losses of over $37.9 million—defendant Williams received a total compensation package worth over $9 million while defendant Perito was given an equally alarming $7.72 million in overall compensation – the highest amounts paid to these individuals in Star Scientific's history.

126.    Over this same time period, defendants were also awarding themselves lucrative stock options and other incentive awards.   At the time the truth concerning the non-existent relationship between the Company and Johns Hopkins was revealed, defendants had vested options entitling them to acquire almost ten million Star Scientific shares at an approximate

exercise price of around $2.30 with the option to acquire another 3.11 million shares yet to be vested.  The vast majority of these options did not expire until 2018 or later according to the Company's 2012 10-K/A.  These shares are in addition to the over 11.7 million actual shares and over 2.6 million warrants to acquire Company stock at exercise prices as low as $1.50 per share that Defendants already owned outright.  In addition, defendants Williams, Perito, and Wright were motivated to continue to pump up the Company's stock price because they held substantial numbers of unvested stock options during the Class Period.  Indeed, as of December 31, 2011, defendants Williams, Perito, and Wright held unvested stocks options numbering 1,715,000, 1,400,000, and 200,000, respectively, which as of that date were collectively valued at over $7.2 million

127.    It is no coincidence that defendants' false and materially misleading statements and omissions started being disseminated shortly after the defendants received these massive stock-based compensation awards.  Indeed, defendants were motivated to pump up the price of the Company's securities in a self-serving effort to maximize the value of their Company shares and cash in their lucrative stock-based incentive awards.  This desire led defendants to do everything in their power to give scientific credibility to anatabine, thereby attempting to increase sales of Anatabloc, drive investor confidence in the future growth and financial prospects of Star Scientific, and ultimately inflate the trading price of the Company's securities with the intent to exercise and liquidate as many of their Star Scientific options and warrants at as high a price as possible.

128.    This is particularly true with respect to defendant Williams who, as of the beginning of the Class Period, had amassed a beneficial ownership interest in over 20,449,573 shares of Company stock—or nearly 13.3% of the total Star Scientific shares outstanding—many

of which were acquired at well-below market rates.  This does not even consider the over 5.5 million shares defendant Williams allegedly "gifted" to his friends, family, business partners, and/or affiliated entities in a series of suspicious transactions since 2006 and over which he undoubtedly still has a financial (if not controlling) interest.  In one such suspicious transaction during the Class Period, according to SEC filings, defendant Williams transferred 1.1 million shares owned by a company he co-owned (with O'Donnell), which were worth more than $3 million at the time, to O'Donnell, but the Company does not disclose the terms of this transaction, whether defendant Williams received any value for this transfer, or whether O'Donnell sold these shares following the transaction.

129.    The aforementioned facts demonstrate or, at a minimum, create a strong inference that defendants knowingly and intentionally withheld and/or misrepresented material information concerning Johns Hopkins' lack of involvement from Star Scientific investors in order to obtain the additional funding necessary to continue the Company's operations.  This bought them the time necessary to further tout the future success of the Company and attempt to profit from the resulting (artificial) increase in the trading price of Star Scientific securities by cashing in their extensive holdings of Company stocks, options, and warrants.

130.    As a result, Lead Plaintiff and the other Proposed Class members were irreparably harmed when, on March 18, 2013, the truth about the relationship between the Company and Johns Hopkins was ultimately revealed—both thwarting the defendants' ultimate plan and costing public investors millions as a result of the subsequent 11.7% drop in Star Scientific's stock price.

## IX.    FRAUD-ON-THE-MARKET AND THE PRESUMPTION OF RELIANCE

131.    For the following reasons, among others, the market for Star Scientific securities was "efficient" at all relevant times:

(a)     There has been a substantial volume in Star Scientific securities during the entirety of the Class Period with an average trading volume of nearly 2 million shares per day;

(b)     Star Scientific filed periodic public reports with the SEC; and

(c)     Star Scientific regularly communicated with public investors via established market communication mechanisms, including regular press releases on the national circuits of major newswire services and other wide-ranging public disclosures (i.e., communications with analysts, the financial press, and other similar reporting services).

132.   As a result of the foregoing, the market for Star Scientific securities promptly digested new information concerning the Company from all publicly available sources and such information was reflected in the then current trading prices of Star Scientific securities.  As a result, the members of the Proposed Class are legally presumed to have relied on all such publically available information—including the false and materially misleading statements made by defendants—when acquiring Company securities.

133.   Accordingly, all members of the Proposed Class have suffered similar injuries in that they acquired their respective Star Scientific securities at a time when the price of those securities was artificially inflated due to the false and materially misleading favorable information made public by defendants.

## X.     NO STATUTORY SAFE HARBOR

134.   The statutory safe harbor protecting certain forward-looking statements provided under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false and misleading statements made by defendants.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance.  Indeed, the statements alleged herein to be false and materially misleading all relate to then-existing facts and conditions.

135.    Even to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Likewise, what verbal "safe harbor" warnings accompanying the defendants' oral forward looking statements during the Class Period were ineffective to shield those statements from liability.

136.    Should the statutory safe harbor be found applicable to any of the false and materially misleading forward-looking statements pled herein, defendants are still liable because, at the time those forward-looking statements were made, the speaker had actual knowledge that they were false or materially misleading and/or the forward-looking statements were authorized or approved by an executive officer of Star Scientific who knew that the statements were false or misleading as of the time they were made.

## XI.    CLASS ACTION ALLEGATIONS

137.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the other members of the Proposed Class.  Excluded from the Proposed Class are defendants, the Company's officers and directors during the Class Period, members of any excluded individual's immediate family, and any firm, trust, partnership, corporation, or other entity in which any defendant or other excluded individual has or had a controlling interest during the Class Period, or which is otherwise affiliated with any defendant or other excluded individual, and the legal representatives, heirs, successors-in-interest, or assigns of such excluded persons.

138.    The members of the Proposed Class are so numerous that joinder of them all is impracticable.  Absent appropriate discovery, Lead Plaintiff cannot ascertain the precise number

of Proposed Class members, however, as of May 10, 2011 (the beginning of the Class Period), Star Scientific had over 135 million shares of common stock issued and outstanding with over 166 million shares outstanding at the end of the Class Period.  At all times, these outstanding shares were owned by hundreds, if not thousands, of individuals and entities—many of whom are believed to be members of the Proposed Class.  The disposition of Lead Plaintiff's and other Proposed Class members' claims in a class action will provide substantial benefits to the parties and the Court.

139.    Questions of law and fact common to all members of the Proposed Class predominate over any questions that affect individual Proposed Class members, including:

(a)    whether defendants' conduct as alleged herein violated the Exchange Act;

(b)    whether defendants publicly disseminated documents, or otherwise made public statements, during the Class Period which omitted and/or misrepresented material facts;

(c)    whether defendants' public statements during the Class Period omitted material facts necessary to make other public statements, in light of the circumstances under which they were made, non-misleading;

(d)    whether defendants knew or deliberately disregarded the fact that the identified public statements were false and/or materially misleading (i.e., whether they acted with scienter);

(e)    whether the prices of Star Scientific securities was artificially inflated at any time during the Class Period as a result of defendants' Exchange Act violations;

(f)    whether the Individual Defendants qualify as "controlling persons" of Star Scientific during the Class Period for purposes of section 20(a) of the Exchange Act; and

(g)     whether (and to what extent) the Proposed Class members sustained damages as a result of defendants' Exchange Act violations as well as the appropriate measure of such damages.

140.    Lead Plaintiff's claims are typical of those of the other Proposed Class members because Lead Plaintiff and the Proposed Class members sustained damages arising as a direct result of defendants' wrongful conduct as alleged herein.

141.    Lead Plaintiff will fairly and adequately protect the interests of the Proposed Class members and has no interests that are contrary to, or in conflict with, those of the other Proposed Class members.   Lead Plaintiff has also retained qualified counsel experienced in federal securities class actions to vigorously and efficiently prosecute this action on behalf of the Proposed Class.

142.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy as, among other things, the damages suffered by the individual members of the Proposed Class may be relatively small, making the expense and burden of bringing separate, individual, actions overly burdensome and essentially impossible. Additionally, the prosecution of separate actions would create a risk of inconsistent and varying adjudications which could impose incompatible standards of conduct upon defendants.

143.    There will be no difficulty in the management of this matter as a class action given, among other things, the skills and expertise of Lead Plaintiff's representatives.   Indeed, the allegations contained herein are based on the investigation of Lead Plaintiff's counsel, including the review of Star Scientific's regulatory filings with the SEC, securities analysts' reports and advisories covering the Company, press releases and other public statements issued by the Company, and various media articles concerning defendants and the Company.   As a result of

such investigation, Lead Plaintiff believes that substantial evidentiary support exists to support the allegations set forth herein and additional support will be obtained following a reasonable opportunity for discovery.

**XII.  COUNT I – AGAINST DEFENDANTS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5**

144.    Lead Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

145.    During the Class Period, defendants disseminated or approved the false statements identified herein.  Defendants knew, or recklessly and deliberately disregarded the fact that certain public statements they made were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary to make those and other statements made, in light of the circumstances under which they were made, non-misleading.

146.    Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted material facts necessary to make the statements made not misleading; and/or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and the other Proposed Class members in connection with their acquisitions of Star Scientific securities during the Class Period.

147.    Lead Plaintiff and the other Proposed Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Star Scientific securities.  Lead Plaintiff and the other members of the Proposed Class would not have purchased Star Scientific securities at the prices they paid, or at all, if they had been aware that

the market prices had been artificially and falsely inflated by defendants' false and materially misleading statements.

### XIII.   COUNT II – AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT

148.   Lead Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

149.   The Individual Defendants acted as controlling persons of Star Scientific within the meaning of section 20(a) of the Exchange Act.  By reason of their positions of control and authority within the Company, the Individual Defendants had the power and authority, directly or indirectly, to cause Star Scientific to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Star Scientific and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

150.   As a direct and proximate cause of the Individual Defendants' wrongful conduct, Lead Plaintiff and members of the Proposed Class suffered considerable damages in connection with the purchases of their respective Star Scientific securities during the Class Period.

### XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as a representative of the Proposed Class;

B.   Awarding Lead Plaintiff and the other members of the Proposed Class damages, including appropriate interest;

C.   Awarding Lead Plaintiff reasonable costs, expert fees, and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XV.   JURY DEMAND

Lead Plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure.

Dated: September 5, 2013                    Respectfully Submitted,

                                           NANCY LOPES

                                           By:  _____/s/_____
                                                Franklin R. Cragle, III
                                                VSB No. 78398
                                                Collin J. Hite
                                                VSB No. 38869
                                                HIRSCHLER FLEISCHER
                                                A PROFESSIONAL CORPORATION
                                                The Edgeworth Building
                                                2100 East Cary Street
                                                Post Office Box 500
                                                Richmond, Virginia 23218-0500
                                                Telephone:   804.771.9500
                                                Facsimile:   804.644.0957
                                                E-mail:      chite@hf-law.com
                                                             fcragle@hf-law.com

                                                *Liaison Counsel for Lead Plaintiff and the
                                                Proposed Class*

                                                Brian J. Robbins, *pro hac vice*
                                                Stephen J. Oddo, *pro hac vice*
                                                Gregory Del Gaizo, *pro hac vice*
                                                Dustin D. Rieger, *pro hac vice*
                                                ROBBINS ARROYO LLP
                                                600 B Street, Suite 1900
                                                San Diego, California 92101
                                                Telephone:   619.525.3990
                                                Facsimile:   619.525.3991
                                                E-mail:   brobbins@robbinsarroyo.com
                                                          soddo@robbinsarroyo.com
                                                          gdelgaizo@robbinsarroyo.com
                                                          egerard@robbinsarroyo.com
                                                          jrieger@robbinsarroyo.com

                                                *Lead Counsel for Lead Plaintiff and the
                                                Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of September, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael F.  Imprevento
BREIT DRESCHER IMPREVENTO & WALKER
Towne Pavilion Center II
600 22nd St, Suite 402
Virginia Beach, VA 23451
Telephone: (757) 670-3884
Facsimile: (757) 299-8035
mimprevento@breitdrescher.com

Marc I.  Gross
Lesley F.  Portnoy
Jeremy A.  Lieberman
POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
600 Third Ave., 20th Floor
New York, NY 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com

Patrick V.  Dahlstrom
POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

Peretz Bronstein
BRONSTEIN GEWIRTZ & GROSSMAN LLP
600 E 42 Street, Suite 4600
New York, NY 10165
Telephone:  (212) 697-6484
Facsimile:  (212) 697-7296
peretz@bgandg.com

Philip Kim
THE ROSEN LAW FIRM PA
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827
pkim@rosenlegal.com

*Counsel for Plaintiff Francis J.  Reuter*

Andrew George Simpson
THE SIMPSON LAW FIRM, PLLC
1921 Gallows Road, Suite 750
Vienna, VA 22182
Telephone:  (703) 548-3900
Facsimile:  (703) 883-0899
andrew@andrewsimpson.com

Reed R.  Kathrein
Peter E.  Borkon
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W.  Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7291
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Nathan M.  Cihlar
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone:  (703) 764-8700
Facsimile:  (703) 764-8704
ncihlar@straus-boies.com

*Counsel for movant STSI Investor Group*

Maurice Francis Mullins
Edward Everett Bagnell, Jr.
SPOTTS FAIN PC
411 E.  Franklin St., Suite 600
P.O.  Box 1555
Richmond, VA 23218
Telephone: (804) 697-2069
Facsimile: (804) 697-2169
cmullins@spottsfain.com
ebagnell@spottsfain.com

Charles Lee Elsen
Nicholas George Terris
Amy Jo Eldridge
K & L GATES LLP
1601 K St., NW
Washington, D.C.  20006
Telephone: (202) 778-9000
Facsimile: (202) 778-9100
charles.elsen@klgates.com
nicholas.terris@klgates.com
amy.eldridge4@klgates.com

*Counsel for Defendants Star Scientific, Inc., Rock Creek Pharmaceuticals, Inc., Paul L.
Perito, Jonnie R.  Williams, Sr., Park A.  Dodd, III and Curtis Wright*

 

 

                                        /s/
                            Franklin R. Cragle, III
                            VSB No. 78398
                            HIRSCHLER FLEISCHER
                            A PROFESSIONAL CORPORATION
                            The Edgeworth Building
                            2100 East Cary Street
                            Post Office Box 500
                            Richmond, Virginia 23218-0500
                            Telephone:    804.771.9500
                            Facsimile:    804.644.0957
                            E-mail:       fcragle@hf-law.com

                            *Liaison  Counsel  for  Lead  Plaintiff
                            and the Proposed Class*

- 73 -